[Crim. No. 7584. In Bank. Oct. 1, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT ARTHUR ANDERSON, Defendant and Appellant.

Paul A. Mansfield, under appointment by the Supreme Court, for Defendant and Appellant.

Robert H. Lund, E. Fred Lightner, William T. Pillsbury, David H. Battin, and Jim F. Kingham as Amici Curiae on behalf of Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Albert W. Harris, Jr., Robert R. Granucci and Michael J. Phelan, Deputy Attorneys General, Louis P. Bergna, District Attorney, and John Schatz, Jr., Assistant District Attorney, for Plaintiff and Respondent.

TOBRINER, J.—Defendant was charged with the murder of a 10-year-old girl, Victoria Hammond. The jury returned its verdict finding defendant guilty of first degree murder; it found defendant sane and fixed the penalty at death. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

We set out our reasons for holding that the evidence did not warrant instructions on murder committed in the perpetration of mayhem or on murder perpetrated by means of torture. We explain why we have concluded that the admission of defendant's incriminating statements in violation of his constitutional right to counsel worked prejudicial error. We point out that the trial court erred in giving an instruc-

tion as to defendant's failure to testify and in permitting the prosecutor to comment upon it. We explain that the court-appointed psychiatrist's testimony at the guilt trial disclosing statements made by defendant during an examination did not result in a constitutional deprivation because the trial court provided the necessary safeguards for defendant's protection. We also set forth the errors committed in the penalty trial.

### The Facts

Defendant, a San Jose cab driver, had been living for about eight months with a Mrs. Hammond and her three children, Cynthia, aged 17, Kenneth, aged 13, and the victim, Victoria, aged 10. On the morning of the day of the killing, December 7, 1962, Mrs. Hammond departed for work and the children left for school. Defendant, who had been drinking, and who had not worked for the past few days, stayed home.

Kenneth testified that when he arrived home from school at about 4:30 p.m. he noticed that all the blinds had been drawn. He went directly to the basement, where he had a microscope, and stayed there approximately 15 minutes. While in the basement Kenneth heard sounds from the room overhead "like she [Victoria] was cleaning up her room" and also heard the shower running. The boy then proceeded upstairs to his room by way of the back porch, changed his clothes, and returned to the back porch, where he knocked on the locked kitchen door. When defendant, dressed only in slacks, opened the door, Kenneth noticed blood on the kitchen floor and asked defendant about it. Defendant answered that he had cut himself. The boy then left the house.

Mrs. Hammond testified that when she returned home at about 5 p.m. she noticed blood on the couch and asked defendant what had happened. Defendant replied that Kenneth had cut himself. When, somewhat later, Mrs. Hammond saw Kenneth, she discovered the falsity of defendant's statement. Confronted with the discrepancy, defendant told her that Victoria, not Kenneth, had been cut but that Victoria was "all right" and visiting a friend. At 6 p.m. Kenneth entered Victoria's bedroom, discovered her brutally slain body under boxes and clothes next to the bed, ran out of the house screaming, and called the police.

When the police arrived, defendant, after first failing to open the door, finally did so. The police saw next to the bed the nude body of the victim pierced by numerous knife

wounds; they found a knife upon the bed and blood throughout the premises. Bloody footprints approximately the size of the victim's feet stained the hallway between the master bedroom and the victim's room. The victim's torn and blood-soaked clothes were found near the body and in an adjoining room. Her dress appeared to have been ripped off; the crotch had been cut out of the panties. Defendant gave the police no explanation as to what had happened. He was then arrested and taken to police headquarters.

The police interrogated defendant that night and the following morning. During the questioning defendant on several occasions requested counsel. Ignoring these requests, the police persisted in the inquiry.

Defendant stated to the police that he must have killed the girl, but insisted throughout the investigation that he did not remember committing the act. He said that he had been drinking when the victim came home late in the afternoon. After he told her that she could not visit a friend until she cleaned up the house, the girl became angry and cursed him. Enraged, he slapped her and, after taking a few more drinks, went out to the kitchen after her. He said that the next thing that he remembered was looking down at the victim's bleeding body. He dragged the body into the bedroom. He then cleaned up some of the blood and showered. In response to lengthy police questioning, defendant admitted that he had engaged in prior oral and manual sexual activity with the victim and described the acts in detail. He denied having attempted any sexual acts with the victim on the day of the killing.

The autopsy report disclosed that the girl died from the result of lacerations of the left lung. The report listed 41 wounds ranging over the entire body from the head to the extremities. One of the cuts extended from the rectum through the vagina. Additionally, the tongue was cut. Many of the wounds, including the latter two, were designated post mortem. Cigarette traces were found in one wound and a cigarette butt in another. The flesh, however, had not been burned. The mortician testified that he observed approximately 20 more superficial cuts, bringing the total to over 60 wounds. Although the hymen was missing, specimens taken from the victim indicated no evidence of spermatozoa.[1]

---

[1] The coroner, being out of town, did not testify, but the coroner's report was admitted into evidence.

The prosecution contended that defendant, after being sexually aroused by alcohol, attempted to molest Victoria again, that she refused and either threatened to implicate defendant or to scream, and that defendant killed her to silence her. The prosecution predicated a first degree murder conviction on any one of the following bases: (1) murder with premeditation and deliberation, (2) murder by means of torture, (3) murder in the perpetration of mayhem, and (4) murder in the commission of a Penal Code section 288 offense.

The defense primarily sought to prove that defendant killed the victim during an epileptic seizure. Thus both Doctors Pinto and Skillicorn testified that defendant's history disclosed epilepsy and that he perpetrated the crime while suffering from a psychomotor seizure. Moreover, defendant's medical records disclosed a number of congenital deformities. Doctor Clark testified that epilepsy is common in persons having defendant's skull defects.

The defense also developed testimony to show defendant's history of prior exhibitions of explosive temper. Mrs. Hammond, testifying for the prosecution admitted on cross-examination that defendant had in the past become violently angry and smashed furniture. Defendant's mother related to Dr. Pinto that defendant had, when angry, broken toilet seats, ripped a phone off the wall, and wrecked a coffee table.

Dr. Walter Rapaport, a court-appointed psychiatrist, testified that defendant did not suffer from any mental condition preventing him from forming a specific intent or from premeditating. The psychiatrist said that in his opinion, defendant, when he killed the young girl, did not undergo an epileptic seizure. Dr. Rapaport pointed out that defendant's behavior following the act was incompatible with the possibility of such a seizure. A considerable amount of conflicting testimony bore upon the question whether defendant suffered from epilepsy and whether at the time of the killing he had suffered an epileptic attack.

While being examined by Dr. Rapaport, defendant gave a description of the events surrounding the death of the victim that was similar to the one he gave the police. In response to a question by the prosecution, Dr. Rapaport testified that defendant told him that he had engaged in sexual misconduct with the victim at times during the several months prior to her death. On cross-examination, Dr. Pinto also acknowledged that defendant had told him of the sexual acts with the victim and of sexual misconduct with the victim's 13-year-old brother.

The prosecution admitted and defendant testified that he had consumed a substantial amount of alcohol on the day of the murder. At 7:45 p.m., approximately three and one-half hours after the killing, an expert for the prosecution took a sample of defendant's blood. At that time defendant registered close to .34 per cent alcohol in the bloodstream, which, the expert explained, reaches well into the range of impairment of the higher centers of the brain. He testified that all individuals, regardless of susceptibility or tolerance, show some signs of impairment at .24 per cent alcohol in the bloodstream. From below .30 per cent to between .40 and .50 unconsciousness results.[2] Numerous prosecution witnesses testified, however, that defendant had shown no signs of drunkenness that evening. The testimony of Mrs. Hammond and defendant tended to establish that defendant had consumed some of the alcohol after the crime.

(1) *The insufficiency of the evidence to warrant certain instructions.*

The court instructed the jury on the prosecution's four possible theories of first degree murder: (a) murder which is committed in the perpetration of mayhem; (b) murder which is perpetrated by means of torture; (c) murder which is committed in the perpetration of any act punishable under Penal Code section 288, and (d) murder which is a wilful, deliberate and premeditated killing. For the reasons hereinafter stated, we discuss under separate headings only the first two theories.

(a) *Murder in the perpetration of mayhem.*

■ The trial court gave the jury an instruction on murder in the perpetration of mayhem. Murder committed in the perpetration or attempt to perpetrate mayhem[3] constitutes first degree murder. (Pen. Code, § 189.) A first degree murder conviction, based on the commission of felony-murder in the course of perpetrating mayhem fails in the instant case, however, since no substantial evidence supports a finding that defendant specifically intended to commit mayhem.

■ To establish a felony-murder, the prosecution must prove that the defendant specifically intended to commit the felony. (*People* v. *Sears* (1965) 62 Cal.2d 737, 743-746 [44

---

[2]The expert testified that at .15 per cent a person unequivocally would not possess adequate judgment to drive an automobile safely.

[3]Penal Code section 203 provides that a ''person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem.''

Cal. Rptr. 330, 401 P.2d 938]; see *People* v. *Morlock* (1956) 46 Cal.2d 141, 146 [292 P.2d 897]; 1 Witkin, Cal. Crimes (1963) pp. 283-284.) ■■ Yet the record here does not disclose substantial evidence showing a specific intent to commit mayhem. The evidence does no more than indicate an indiscriminate attack; it cannot independently uphold a verdict based on the precise premise that defendant entertained the specific intent to commit mayhem. Thus, as we said in *People* v. *Sears, supra,* at p. 745, "In the absence of such a showing of specific intent to commit mayhem, the court should not give the jury an instruction on felony murder mayhem."

(b) *Murder perpetrated by means of torture.*

■■ In order to support murder by torture, the evidence must demonstrate that "the assailant's intent was to cause cruel suffering on the part of the object of the attack, either for purposes of revenge, extortion, persuasion, or to satisfy some other untoward propensity." (*People* v. *Tubby* (1949) 34 Cal.2d 72, 77 [207 P.2d 51].) Thus, in *Tubby* the viciousness of the attack alone could not justify a murder by torture. The court stated, "It is too apparent to admit of serious doubt that the unprovoked assault was an act of animal fury produced when inhibitions were removed by alcohol. The record dispels any hypothesis that the primary purpose of the attack was to cause the deceased to suffer." (*Id.* at p. 78; see *People* v. *Bender* (1945) 27 Cal.2d 164, 177-178 [163 P.2d 8].)

Those cases in which this court has upheld convictions of murder by torture have all involved some evidence tending to prove the requisite intent. In *People* v. *Turville* (1959) 51 Cal.2d 620, 632 [335 P.2d 678], the assailants tortured the victim in order to persuade him to tell them the combination to a safe. In *People* v. *Daugherty* (1953) 40 Cal.2d 876, 886 [256 P.2d 911], in which a husband was convicted of murder by torture of his wife, the couple's relationship involved prior threats, marital strife, and the husband's anger over divorce proceedings. The husband made statements prior to the killing that indicated "as well as an intent to kill, a wish to seek vengeance [on his wife] so as to cause her to suffer." (*Ibid.*) Furthermore, when the victim "was lying on the ground but still alive, he stood over her and kicked her." (*Id.* at p. 887.) Finally, in *People* v. *Gilliam* (1952) 39 Cal.2d 235 [246 P.2d 31], the defendant beat the victim to death in a jail cell over the course of an hour while two other inmates periodically attempted to stop him. The court stressed the

fact that the defendant desisted from his attack only when the victim gave his last gasp.

In contrast, the evidence in the instant case shows only an explosion of violence without the necessary intent that the victim should suffer. Although a cigarette butt was found in one of the wounds, the flesh was not burnt; the presence of the butt alone cannot support the conclusion that defendant intended to "cause cruel suffering." (*People* v. *Tubby, supra,* 34 Cal.2d 72, 77.) Accordingly, the evidence was not sufficient to convict defendant of murder in the first degree on the theory that death resulted from acts of torture.

As this court has said, "It is error to give an instruction which, although correctly stating a principle of law, has no application to the facts of the case." (*People* v. *Eggers* (1947) 30 Cal.2d 676, 687 [185 P.2d 1].) Unlike *Eggers* the instant case is not one in which the erroneous instructions caused only harmless error. We are unable to determine which of the prosecution's theories served as the basis for the jury's verdict. Moreover, the evidence bearing on the prosecution's other theories supporting murder in the first degree was not strong enough for us to say that as a result of the erroneous instructions the "defendant suffered no prejudice." (*Id.* at pp. 687-688; see *People* v. *Robinson* (1964) 61 Cal.2d 373, 405-406 [38 Cal.Rptr. 890, 392 P.2d 970]; *People* v. *Orcalles* (1948) 32 Cal.2d 562 [197 P.2d 26].) Accordingly we must reverse the conviction.

Since we reverse on the above grounds and since the evidence adduced at the new trial may differ from that introduced at the instant one, we do not pass on the instructions which we designated *supra* as (c) and (d). We need not consider defendant's contention that the evidence is insufficient to sustain a verdict based on the theories that the killing was premeditated and deliberate or that defendant killed while perpetrating an act punishable under section 288 of the Penal Code. (See *People* v. *Granados* (1957) 49 Cal.2d 490 [319 P.2d 346]; *People* v. *Craig* (1957) 49 Cal.2d 313 [316 P.2d 947]; *People* v. *Tubby, supra,* 34 Cal.2d 72.)

(2) *The right to counsel.*

When "the officers have arrested the suspect and the officers have undertaken a process of interrogations that lends itself to eliciting incriminating statements, the accusatory or critical stage has been reached and the suspect is entitled to counsel" under *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]. (*People* v. *Stewart* (1965) 62 Cal.2d 571, 577 [43 Cal.Rptr. 201, 400 P.2d 97].) When

defendant made his incriminating statements he was under arrest. Defendant was subjected to lengthy interrogations at the police station. The portion of the transcript quoted below (fn. 4, *infra*) clearly discloses that the police not only accused defendant of committing the crime but sought to elicit from him incriminating statements. These factors establish that at the time defendant gave the incriminating statements the police were carrying out a process of interrogations that lent itself to eliciting incriminating statements. Accordingly, the accusatory stage had been reached, and defendant was entitled to counsel.

Despite defendant's repeated requests for counsel[4] the

---

[4]The record discloses the following colloquy between defendant and the interrogating police officers, prior to the time defendant gave his incriminating admissions:

"Q. What is the reason for it? A. Sure, I, I think I have a legal right to a lawyer. Right?

"Q. You have a legal right to a lawyer, that's right. What's the little girl's name out there that was killed? What about her legal rights? What about her legal rights? Don't you think she's entitled to a little something, too? I want to know what happened out there, Anderson. You said the kid came home and talked back to you. What else happened? A. Sir?

"Q. What else happened? A. I have nothing more to say.

"Q. Now, do you want to go back out there and take a look at what you did, Anderson? Would it refresh your memory? A. I have nothing more to say.

"Q. You're so proud of it, maybe you'd like to see it once more? Would you like to go back out there and see what you did? Anderson? . . .

"Q. Well, what do you remember about what happened? This is what I want to know. Maybe I can help you piece it together. A. Well, sir, I'll tell you this . . . . I'd like to have a cigarette and then I'd like to get hold of a kind of lawyer. I just don't know what's going on. I know what I've done.

"Q. What have you done? Say it and get it off your chest. You killed a ten-year-old girl. You've been under gunfire you tell me. You ought to be able to admit something like that. Well, you want to go out to the rest room . . . all right. . . . ·

"Q. Well, was she this time? Was she sassy? What did she say? Was it a smart remark to you? A. Gentlemen, I just don't know. I'm so goddam screwed up.

"Q. All right, well let's see how you feel at this time. But——

"Q. You're sitting on the couch. You've been drinking. A. Gentlemen?

"Q. She came home—— A. Look——

"Q. Bob, think now. A. I——

"Q. Just a minute. A. No, I, wanta talk to a lawyer anyways.

"Q. Do you find this necessary? That what you say you have something to hide. Is that right? A. No, I got nothing to hide, but I want to talk to him and see what he says. . . .

"Q. You know, Bob. It's a question of whether or not you want to remember, or is it a question of whether or not you just don't want to tell us? Now which is it? You want a lawyer? (inaudible). A. Well, I want to talk to (inaudible)."

police improperly persisted in questioning him. Although upon the commencement of the inquiry defendant did not immediately demand counsel, but said that he could not remember what had happened, he did not thereby forfeit his right to counsel. Before he gave the incriminating statements he asked for counsel; the request does not lose its force because the questioning continued. The denial of the right to counsel by evasion or neglect of the suspect's request for counsel constitutes no less a constitutional violation than a denial by explicit rejection. In *Escobedo* the United States Supreme Court held that defendant's statements uttered during the prearraignment accusatory stage cannot be admitted into evidence if, at that stage, he has been denied his right to counsel. Since the police, by ignoring defendant's request for counsel at the accusatory stage, deprived him of his constitutional right to counsel, the admission of statements elicited during that time was erroneous. (*Escobedo* v. *Illinois, supra,* 378 U.S. 478.)

Whether or not we regard defendant's statements as a confession, in which case a reversal is compelled (*People* v. *Schader* (1965) 62 Cal.2d 716, 728-731 [44 Cal.Rptr. 193, 401 P.2d 665]; *People* v. *Dorado* (1965) 62 Cal.2d 338, 356 [42 Cal.Rptr. 169, 398 P.2d 361]), the introduction of such statements was in any event "so damaging to defendant that we cannot say that they caused only harmless error under article VI, section 4½ of the California Constitution." (*People* v. *Forbs* (1965) 62 Cal.2d 847, 851, 852 [44 Cal.Rptr. 753, 402 P.2d 825].) His statement of the sequence of events is the only direct evidence which bears upon deliberation and premeditation. (See *ibid.*; *People* v. *Sears* (1965) 62 Cal.2d 737, 742-744 [44 Cal.Rptr. 330, 401 P.2d 938].)

Defendant's statements were clearly incriminating and prejudicial. At the repeated prompting of the interrogator, defendant stated he remembered "slapping" the child across the face; at this time "she was just by the kitchen door"; she was then "yelling and calling me names"; "she kept it up" and defendant became enraged at the girl. Defendant further said, "I must have picked up the knife and went in the kitchen and stabbed her"; when asked, "where was she when you stabbed her," defendant answered that "she was in the kitchen" standing in front of the sink. Defendant stated at one point, "just stabbed her, stabbed her, stabbed her, I don't know."

The introduction of defendant's statements caused

similar, if not greater, prejudice in another respect. Defendant admitted that on prior occasions he had engaged in sexual acts with the young girl in violation of section 288 of the Penal Code. Although the psychiatrists related to the jury defendant's statements as to such offenses, this abbreviated and limited account effected no such prejudicial consequences as defendant's elaborate and sordid description of his activities. Furthermore, the court restricted the two psychiatrists' repetition of the defendant's statements as to his misconduct by the instruction that defendant's statements to them ''may be considered for only the limited purpose of showing the information upon which the physician based his opinions. The statements so repeated by him may not be regarded as evidence of their own truth.''[5] As a result, the jury, in finding whether defendant committed first degree murder, could not regard the physician's testimony of defendant's statements as evidence of the truth of such statements; defendant's admissions to the police, however, could certainly be so evaluated.

Whether or not proof of previous sexual misconduct would sufficiently support a conclusion that the murder occurred in the course of a sex offense or that the murder was premeditated and deliberate, the distasteful nature of defendant's account must have influenced the jury's verdict. It constituted more than mere harmless error; combined with the defendant's narration of the events immediately preceding the moment he ''stabbed her,'' this detailed account of sexual misconduct effected prejudice and compels reversal. (Cal. Const., art. VI, § 4½.)

(3) *The comment on defendant's failure to testify.*

The United States Supreme Court recently held that an instruction to the jurors allowing them to draw an inference adverse to the defendant from his failure to testify and that prosecution arguments seeking to exploit such failure result in a denial to that defendant of due process of law under the Fourteenth Amendment of the United States Constitution. Such instructions and arguments penalize him for invoking his constitutional right not to incriminate himself. (*Griffin* v. *California* (1965) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106].) The trial judge in the instant case gave the instruction condemned in *Griffin*; the prosecutor commented on defendant's failure to testify; the instruction and the comments de-

[5]1 BAJI No. 33-D (old form). The revised instruction provides that statements by the patient are admissible if they constitute an admission against interest.

prived defendant of due process of law. Since we reverse on other grounds, however, we do not discuss the issue whether the comments on the defendant's failure to testify in itself requires reversal. (See *People* v. *Bostick* (1965) 62 Cal.2d 820 [44 Cal.Rptr. 649, 402 P.2d 529].)

(4) *Instruction on diminished capacity.*

 Defendant contends that the trial court should have told the jury on its own motion that mental aberration can preclude the requisite specific state of mind necessary for first degree murder. The Attorney General argues that defendant's defense of unconsciousness, which was the subject of an instruction to the jury,[6] conflicts with a defense based on the concept of "diminished responsibility" and that defendant, relying upon unconsciousness, therefore did not produce evidence sufficient to warrant an instruction as to mental illness not amounting to legal insanity. Defendant replies that although he attempted to prove that as a result of an epileptic attack he lost consciousness, much of his evidence as to that defense also indicated "diminished responsibility," and that accordingly the trial judge should have given an instruction on that theory.

The theory that a mental disease or defect not amounting to legal insanity may negate the existence of an element of a crime has been adopted in California in *People* v. *Wells* (1949) 33 Cal.2d 330 [202 P.2d 53], and *People* v. *Gorshen* (1959) 51 Cal.2d 716 [336 P.2d 492]. (See *People* v. *Henderson* (1963) 60 Cal.2d 482 [35 Cal.Rptr. 77, 386 P.2d 677]; *People* v. *Baker* (1954) 42 Cal.2d 550 [268 P.2d 705]; Weihofen, Mental Disorder as a Criminal Defense (1954) 175 et seq.; Lindman & McIntyre, The Mentally Disabled and the Law (1961) 355-357; Diamond, Some Observations About the Genesis of the Gorshen Case, in Donnelly, Goldstein, Schwartz, Criminal Law (1962) 688; Louisell & Hazard, *Insanity as a Defense: The Bifurcated Trial* (1961) 49 Cal. L.Rev. 805; A.L.I. Model Penal Code (1962) § 4.02 (1).)

We have designated the theory of these cases by the misnomer of "diminished responsibility," but, more accurately, we mean diminished capacity to achieve the state of mind requisite for the commission of the crime.[7] (See *State* v.

---

[6] The trial judge also told the jurors that they should consider evidence of intoxication for the purpose of determining the intent with which the act was committed.

[7] The actual doctrine of "diminished responsibility" which is a feature of the English Homicide Act (Homicide Act, 1957, 5 & 6 Eliz. 2, c. 11, pt. I, § 2; see Lindman & McIntyre, The Mentally Disabled and the Law

*Padilla* (1959) 66 N.M. 289 [347 P.2d 312, 314, 78 A.L.R.2d 908]; Lindman & McIntyre, *supra,* at p. 357; Weihofen & Overholser, *Mental Disorder Affecting the Degree of a Crime* (1947) 56 Yale L.J. 959.) In the landmark case of *People* v. *Wells, supra,* 33 Cal.2d 330, we held that evidence should be received "to prove or disprove the existence of a particular mental state" (p. 347) which must exist in the commission of "classes of crimes" requiring "a specific mental state" (p. 346). Clearly we cannot hold defendant responsible for a crime which requires as one of its elements the presence of a state of mind which he is incapable of achieving because of subjective abnormality or impaired volitional powers. (*People* v. *Gorshen, supra,* 51 Cal.2d 716, 727; 12 Stan.L.Rev. (1959) 226.)[8]

Applying this doctrine, the courts have held that evidence of any mental condition, whether it be caused by a mental disease of defendant (see, e.g., *People* v. *Henderson, supra,* 60 Cal.2d 482, 490-494) or by intoxication (Pen. Code, § 22; see *People* v. *Modesto* (1963) 59 Cal.2d 722, 729-730 [31 Cal.Rptr. 225, 382 P.2d 33]; *People* v. *Gorshen, supra,* 51 Cal.2d 716, 727-728, 731-734; *People* v. *Baker, supra,* 42 Cal.2d 550, 571-573; *People* v. *Sanchez* (1950) 35 Cal.2d 522, 531 [219 P.2d 9]) or by drugs (*People* v. *Baker, supra,* 42 Cal.2d

(1961) 357; see also A.L.I. Model Penal Code (1962) § 4.02(2)) provides that mental disease or defect may serve as a ground for a reduction of the crime or mitigation of punishment.

A California special commission on insanity and criminal offenders stated in its first report, "The rule of the *Wells* and *Gorshen* decisions is sometimes inaccurately referred to as a rule of 'partial insanity' or 'partial responsibility.' This way of describing the rule is inaccurate because the question is not whether the defendant is or is not responsible; the question is whether he had the mental state that is an essential element of the crime charged. Voluntary intoxication does not make a defendant unaccountable under the criminal law, but it may show that he did not have the intent required for the crime of which he is accused. The *Wells-Gorshen* rule is simply an application of that principle to the situation where it is the defendant's mental condition rather than his state of intoxication that renders him incapable of forming the required intent or possessing the required mental state." (Special Commissions on Insanity and Criminal Offenders—First Report (1962) 29.)

[8] In *People* v. *Henderson, supra,* 60 Cal.2d 482, two psychiatrists testified with respect to the defendant's mental condition and stated their opinions that he did not premeditate the killing. One testified that the defendant "was unable to utilize normal volitional control over his actions." (P. 489.) We held that the court should have given on its own motion an instruction as to defendant's defense negating the specific mental states essential to the crime. In *People* v. *Baker, supra,* 42 Cal.2d 550, 569, evidence indicating that epileptic attacks affected defendant's mental condition was relevant on the question of his "capacity to premeditate and deliberate."

550, 572) is relevant to prove that the defendant was incapable of harboring the particular mental state constituting an element of the offense.

In attempting to prove unconsciousness, which is a complete defense, negating the capacity to commit any crime (Pen. Code, § 26, subd. Five; see *People* v. *Gorshen, supra,* 51 Cal.2d 716, 727), defendant did not tender the defense of diminished capacity. In fact, defendant's counsel told the jury that if it found that defendant had been conscious at the time of the killing, he could have formed the necessary intent to commit the crime. Nevertheless, we have held that if the evidence indicated an issue of diminished capacity the trial court should have given the appropriate instruction on that issue.[9] (*People* v. *Henderson, supra,* 60 Cal.2d 482, 491-494.) Moreover, the instruction actually given in the instant case was the same type of instruction that we condemned in *People* v. *Henderson, supra,* at page 492: "The intent with which the act is done is manifested by the circumstances attending the act, the manner in which it is done, the means used, and the sound mind and discretion of the person committing the act. All persons are of sound mind who are neither idiots nor lunatics nor affected with insanity." As we said in *Henderson,* "Based on the only criteria it was given, the jury could only have found that defendant was of 'sound mind.' The effect of the instruction that defendant was of sound mind together with the failure to instruct on the significance of his defense of diminished responsibility was to withdraw from the jury all consideration of the evidence introduced in support of that defense." (*Id.* at p. 493.)

Since defendant now argues for the applicability of the diminished capacity doctrine, presumably he will advance that theory at the new trial and request the appropriate instruction. In that eventuality, and assuming the presentation of adequate testimony on the issue, the trial court should instruct on that subject matter since, as we said in *Henderson,* "It can no longer be doubted that the defense of mental illness not amounting to legal insanity is a 'significant issue' in any case in which it is raised by substantial evidence." (*Id.* at p. 490.)

(5) *The testimony of court-appointed psychiatrist.*

 Defendant contends that testimony of the court-

---

[9]We are not called upon to decide whether defendant produced sufficient evidence to require the rendition of the instruction at the instant trial.

appointed psychiatrist concerning statements made to him by the defendant during a psychiatric examination deprived him of due process of law. Defendant complains that he was confronted with the choice of giving the psychiatrist incriminating statements, which could later be used at the guilt phase of the trial, or of failing to cooperate with the psychiatrist and thereby impairing his opportunity to obtain an impartial determination of his mental state. We have rejected defendant's contention on several occasions. (*In re Spencer* (1965) *post*, p. 400 [46 Cal.Rptr. 753, 406 P.2d 33]; *People* v. *Spencer* (1963) 60 Cal.2d 64, 83 [31 Cal.Rptr. 782, 383 P.2d 134]; *People* v. *Ditson* (1962) 57 Cal.2d 415, 447-448 [20 Cal.Rptr. 165, 369 P.2d 714]; *People* v. *Combes* (1961) 56 Cal.2d 135, 149 [14 Cal.Rptr. 4, 363 P.2d 4].)

We held in the most recent *Spencer* case, however, that if the court-appointed psychiatrist may reveal defendant's statements at the guilt trial, defendant should be entitled to the protection of counsel at the psychiatric examination. Yet, in order to avoid the disruption of psychiatric examinations by court-appointed psychiatrists, we established certain safeguards to assure that the courts' refusal to permit the presence of defendant's counsel during such an examination would not involve a constitutional deprivation. Thus we stated that the court-appointed psychiatrist should not be permitted to repeat the defendant's statements at the guilt trial unless the defendant specifically placed his mental condition into issue. Moreover, the trial judge should instruct the jury that the psychiatrist's testimony at the guilt trial which disclosed defendant's statements should be considered only for the purpose of exposing the information upon which the psychiatrist based his opinion and not as evidence of the truth of the statements.

Since defendant in the instant case specifically raised the issue of his condition at the guilt trial by introducing evidence that he had suffered from an epileptic attack and since the trial judge gave the limiting instruction (see 1 BAJI, No. 33-D (old form)), the court-appointed psychiatrist's testimony as to defendant's incriminating statements uttered during an examination did not violate defendant's constitutional rights. (*In re Spencer, supra, post,* p. 400 [46 Cal.Rptr. 753, 406 P.2d 33].)

██ Defendant further contends that even if the court-appointed psychiatrist may testify regarding defendant's statements during an examination, the psychiatrist should not be permitted to relate defendant's statements concerning his

past sexual misconduct since the prejudicial and inflammatory nature of such testimony far outweighs its probative value.

The resolution of the issue of the admission of this testimony lies within the sound discretion of the trial judge. The effect of the testimony can indeed be damaging; trial courts are, and should be, alert to the dangers involved in admitting it. But in the instant case, defendant's statements contained relevant matter which the psychiatrists considered. The defendant's own psychiatrist, Dr. Pinto, testified that in his opinion abnormal sexual behavior, although not necessarily indicating epilepsy, sometimes results from a condition causing epilepsy. By his exclusion of inflammatory evidence of little probative value, the trial judge indicated to the jury that the testimony should be viewed with caution. We cannot say that he abused his discretion in allowing the introduction of the questioned testimony.

(6) *The error in penalty trial.*

The trial judge instructed the jury that "every person guilty of murder of the first degree shall suffer death or confinement in the State Prison for life in the sole discretion of the jury. . . . In making your determination as to the penalty to be imposed, you may, in exercising your discretion to choose between different punishments, consider as a possible consequence that the law of this State provides that a defendant sentenced either to death or life imprisonment may be pardoned or have his sentence reduced by the Governor, and that a prisoner serving a life sentence may be eligible for parole, but not until he has served at least seven years. A trial judge may also reduce the penalty from death to life imprisonment." A member of the Adult Authority testified as to the average time served by defendants convicted of first degree murder and as to the legal minimum period of incarceration for the crime of murder in the first degree. We have held that such instructions and such evidence are erroneous (*People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33]) and prejudicial (*People* v. *Hines* (1964) 61 Cal.2d 164, 170 [37 Cal.Rptr. 622, 390 P.2d 398]).

The judgment is reversed.

Traynor, C. J., Peters, J., and Peek, J., concurred.

SCHAUER, J.,* Dissenting.—On each and all of the theories presented by the state, the record before us, disregarding

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

defendant's admissions, appears to me to overwhelmingly establish that defendant sexually attacked, mutilated and killed the 10-year-old daughter of the woman with whom he had been living. The little girl's body mutely evidenced the grisly facts; there was no substantial issue as to identity of the perpetrator. Nothing said in the majority's discussion of technical procedural questions casts doubt on the stated proposition.

The majority's discussion does, however, leave me with the impression that they are failing to honor the long established principle of appellate review which Mr. Witkin thus articulates: "After the jury (and the trial judge ruling on a motion for new trial) have found the defendant guilty, the presumption of innocence is replaced by the presumption in favor of the judgment, and a reversal can be ordered only if, upon no rational hypothesis, is there substantial evidence to support the judgment." (Witkin, Cal. Criminal Procedure (1963) Appeal, § 683, p. 667.)

The quoted principle, as I understand the duties of a reviewing court, applies both in determining whether error has in fact occurred, and if so, whether it has worked a miscarriage of justice. The burden is on the appealing defendant to affirmatively establish California's constitutionally defined requisite for reversal.

In the circumstances of this case I do not find that defendant's conviction and sentence constitute a miscarriage of justice. (See Cal. Const., art. VI, § 4½; *People* v. *Watson* (1956) 46 Cal.2d 818, 835-836 [12] [299 P.2d 243].) I would affirm the judgment.

McComb, J., and Burke, J., concurred.