[Crim. No. 16274. Second Dist., Div. Five. Feb. 25, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD E. ALVAREZ, Defendant and Appellant.

**COUNSEL**

Martin Wolman, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and William V. Ballough, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

### FRAMPTON, J. pro tem.*—

### *Statement of the Case*

Defendant was charged by information with the murder on June 12, 1968, of Roger Estrada Garcia. (Pen. Code, § 187.) Upon trial by jury he was found guilty and the degree was fixed as murder of the second degree. Defendant's motion for a new trial was denied, probation was denied after hearing, and he was sentenced to state prison. The appeal is from the judgment.

### *Statement of Facts*

On June 12, 1968, Kenneth Arguelles lived in apartment 240 at the Carleton Apartments located at 8615 Whittier Boulevard in the City of Pico Rivera, County of Los Angeles. At about 1:30 or 2 p.m. on the 12th he heard the defendant, who lived next door in apartment 241, call out "Ken." Arguelles went to the defendant's apartment and observed him backed up against the cupboard. The decedent, Garcia, was standing in front of the defendant facing him. Defendant was holding his left arm. Garcia was also a tenant in the building and lived there with his wife. Garcia turned toward Arguelles, at which time the defendant screamed, "Grab your gun."

Arguelles went to his apartment and picked up his revolver. When he returned to the defendant's apartment, there was no one there. He heard footsteps going down the stairs and took off down the stairway. He reached the ground floor and as he turned around the side of the building, he saw the defendant go into a fast crouch. The defendant fired once with a pistol in the direction of the street in the vicinity of Walt's Liquor Store which was located nearby. The defendant's arm was cut and bleeding. The wound appeared to be an inch and a half to two inches long and gaped open at least three-quarters of an inch. Arguelles started to move toward the defendant. The defendant then started to move and told Arguelles to go the other way. Garcia fell to the ground in front of the liquor store. The defendant ran up to Garcia with gun in hand. Defendant then pointed his gun at Garcia who was lying on his left side. A knife was lying on the ground about a foot and a half from Garcia's waist area.

William Roberson, a bystander, walked across the street to the scene. Roberson told the defendant, "Now, just take it easy. You have him down.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

We will call the police and they will take care of it." The defendant asked Garcia, "Did I hit you?" and Garcia pulled up his pants leg indicating that he had been hit. Garcia then said, "Don't shoot me again," and held up his right hand. The defendant then looked at the cut on his left arm, turned, and fired another shot into Garcia, saying, "You cut me. . . . I told you not to fuck with me." Garcia then brought his left hand up to his chest area. Garcia kept saying, "Give me a chance. Give me a chance. Give me a break." He had no weapon in either hand. One of them said to the other "You raped my wife."

Roberson told the defendant after the second shot was fired that "there was no sense in that," whereupon the defendant turned his gun on Roberson, saying, "Get away from here, man. Get me something to wrap this arm up with." Roberson turned, walked to the door of the liquor store and asked for a towel. As he turned to go back, he heard three more shots fired, saw Garcia's body convulse and lurch forward to a prone position. Garcia had nothing in his hands at this time. The defendant then turned and walked back toward the Carleton Apartments.

Garcia suffered three fatal gunshot wounds. One bullet penetrated the right body wall between the second and third ribs and through the lung. One bullet entered the right side of the body going upward through the right and left ventricles of the heart and through the left upper lobe of the lung. The third bullet went through the right lobe of the liver upward through the posterior border of the stomach then through the left body wall exiting in the left posterior flank. Each of these bullets inflicted a fatal wound. Four additional nonfatal gunshot wounds were found. Seven bullets struck the deceased. Five bullets were recovered from the decedent's body. Three of these were identified as having been fired from the defendant's gun. Two bullets taken from the body and one found on the ground under the body contained rifling characteristics similar to those contained on a test bullet fired from the defendant's gun.

Shortly after the shooting the defendant walked into the Pico Rivera Community Hospital. Dr. Paul Hwang examined him there. He found two knife wounds over the left medial forearm of the defendant. The wounds were bleeding moderately. The defendant looked pale, possibly due to loss of blood, but Dr. Hwang did not feel that a blood transfusion was necessary. Dr. Hwang treated and bandaged the wounds but did not suture them as deputies from the sheriff's office removed the defendant, with Dr. Hwang's consent, before the treatment was completed. Dr. Hwang testified that the defendant was oriented, was slightly faint but was under great emotional stress when he walked into the hospital.

James A. Orr, a deputy sheriff, arrived upon the scene at approximately

2:15 p.m. He observed Garcia lying on the ground and requested someone to call an ambulance. He immediately went to apartment 241 of the Carleton Apartments with another deputy. He observed blood spattered in and around the wall and table area in the kitchenette, and the defendant's gun on a table. He also observed bloodspots on the door of the apartment as well as on both the east and west end stairwells.

Deputy Berend W. Kammer observed drops of blood leading from the decedent's body to the stairway of the building, and going up the stairway to the third floor of the building. He took possession of the defendant's gun and observed a small smear of blood and a piece of skin in the area of the trigger and trigger guard. He also found five empty .22 calibre cartridges lying within a 5-foot radius of the decedent's body, and three empty .22 calibre cartridges and a .22 calibre bullet lying under the body.

John A. Rondina, a deputy sheriff, saw the defendant at the Pico Rivera Hospital between 2:30 and 2:45 p.m. on the 12th. He was lying in a hospital bed. The defendant appeared to be a little weak but did not appear to be in shock. He appeared to be rational then. The defendant was arrested and transferred to the general hospital.

*Defense*

The defendant testified that on June 12, 1968, at 2 p.m. he was cooking a meal in his apartment. He turned as he heard the decedent enter his apartment through the open door. The decedent began yelling that his wife had accused the defendant of raping her. The defendant walked over to a table where he placed a plate and a cup of coffee. He then turned around quickly and fell back against the wall as the decedent came at him with a knife. The decedent cut the defendant on the arm and the latter fell. He called to Ken, and the decedent cut him a couple of more times. Ken arrived at the door as the decedent went out the door. The next thing the defendant knew he was at the drawer and had his gun in his hand. He remembered falling down stairs and hitting his shoulder. He next saw the decedent standing with a knife in his hand. Defendant crouched and brought his hand up and pointed the gun at the decedent. He did not remember the gun going off.

The defendant testified that when he was in the driveway of the apartment, or was going over the wall between the driveway and the parking lot of the liquor store, the decedent fell and he stood over him. The decedent said that he was on parole, he was going to kill the defendant, and that he was not going back to jail for him. Decedent went for his knife. The defendant told him to stay still, but the decedent picked up the knife and the defendant shot him. The defendant thought he had hit the ground. He was bleeding and felt dizzy as if he was going to faint. William Roberson came

up at this time. Defendant did not remember how many times he fired. The decedent again threatened to kill the defendant, picked up the knife and came at the defendant and the defendant shot him the second time. The next thing he remembered was Joanne (Yolanda) Barrios putting a rag around his arm. He did not recall driving to the Pico Rivera Hospital. He felt like he was dead.

Bearing upon the defendant's appearance and conduct, the witness Roberson described him as being "quite upset," "ill," "white." The witness Precillano Loya described him as bleeding "very heavy" from his left arm and "in shock." Dr. Paul Hwang described him as being "in great emotional stress," "excited and pale because of the blood," "pale . . . slightly sweaty." The witness Kenneth Arguelles described the defendant as "like he was drained out . . . completely white. . . . His forehead had perspiration on it . . . looked pale." The witness Lawrence Montoya described the defendant as being "in sort of like a daze," "he didn't seem to be conscious of too much of what was going on around," "awfully white," "swayed from side to side a little bit," "he wasn't really aware of what was going on as far as sound was [concerned]," "he heard me, but it was like he wasn't really conscious of it." The witness Joanne Barrios described the defendant as "He was— just when I seen him walking he was walking around like a zombie, you know, just like he didn't know—like he didn't know what was going on or anything, just walking around in a daze."

### Contentions on Appeal

The defendant urges that (1) the trial court committed reversible error in failing, *sua sponte,* to instruct the jury on the defense of diminished capacity, and (2) the trial court's instruction to the jury relating to felony murder constituted reversible error.

### Diminished Capacity

■ "It has long been settled that evidence of diminished mental capacity, whether caused by intoxication, trauma, or disease, can be used to show that a defendant did not have a specific mental state essential to an offense." (*People* v. *Conley,* 64 Cal.2d 310, 316 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Gorshen,* 51 Cal.2d 716, 731 [336 P.2d 492].) ■ Malice aforethought on the part of the accused at the time of the commission of the offense is an essential element of the crime of murder of the second degree. (*People* v. *Wolff,* 61 Cal.2d 795, 819 [40 Cal.Rptr. 271, 394 P.2d 959].) ■ There is evidence in the record to show that a serious traumatic injury was inflicted upon the person of the defendant by the decedent within minutes of the time that the defendant fired the fatal shots. There is

also evidence in the record sufficient to support an inference that the defendant's capacity to entertain malice aforethought at the time of firing the fatal shots may have been impaired as a result of such injury. In this state of the record, we believe the trial court should have instructed on the law of diminished capacity so that the jury could have determined from the evidence, under proper instructions, whether the defendant's mental capacity was diminished, as a result of his injury, to the extent that he was unable to entertain malice aforethought towards the decedent at the time the homicide was committed, and that it was error not to instruct, *sua sponte*, on this issue. (*People* v. *Anderson,* 63 Cal.2d 351, 366 [46 Cal.Rptr. 763, 406 P.2d 43].)

### *Felony Murder Rule*

██ The trial court, at the request of the People, instructed the jury that: "Murder of the second degree is the unlawful killing of a human being with malice aforethought which is not perpetrated by means of wilful, deliberate, and premeditated killing.

"In practical application this means that the unlawful killing of a human being with malice aforethought is murder of the second degree in any of the following cases:

".    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"(3)    When the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life, such as assault with a deadly weapon."

The foregoing instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which constitutes an offense included therein. The giving of the instruction in the instant case had the effect of relieving the jury of the necessity of finding one of the elements of murder, to wit, malice aforethought. (*People* v. *Ireland,* 70 Cal.2d 522, 537-539 [75 Cal.Rptr. 188, 450 P.2d 580].) Here, the assault with a deadly weapon was an integral part of the homicide.

It was the province of the jury to determine from all the evidence, upon proper instructions as to the law, whether the defendant at the time the fatal shots were fired entertained malice aforethought towards the victim.

It was prejudicial error not to instruct the jury on the law of diminished capacity, and to instruct on the felony-murder rule.

The judgment is reversed.

Kaus, P. J., and Reppy, J., concurred.