[Crim. No. 4979. Fifth Dist. Apr. 26, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN ARTHUR FREE, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Richard L. Phillips, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Ramon de la Guardia and Maureen A. Daly, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ANDREEN, J.—Appellant, John Arthur Free, was charged jointly with his brother Joe with murder (Pen. Code, § 187). He was tried separately and found guilty of second degree murder. The jury further found that he used a firearm during the offense (Pen. Code, § 12022.5). He appeals, alleging prosecutorial misconduct and instructional error.

FACTS

Appellant, his brother Joe and the decedent Fear became embroiled in a barroom brawl in Modesto. According to prosecution witnesses, prior to the fight appellant left the bar to obtain a .45 caliber pistol. When he returned he had something heavy and awkward in front of his pants and had his jacket buttoned up, although it was not cold. It was appellant's contention that he did not leave the bar that night and that it was the decedent, Luther Fear, who introduced the gun into the struggle. This was the only major discrepancy at trial. The action took place in full view of several bar patrons.

Just before the killing, appellant was standing behind Fear and some others. After some words were exchanged Fear said, "You son of a bitch" and stood up.[1] As he stood he threw some objects on the table, including an expended .45 caliber slug, and backhanded appellant across the face. Appellant, who was smaller than Fear, staggered backward.

---

[1]Appellant's brother was seeing the decedent's wife. Apparently Fear mistook appellant for his brother.

Fear then knocked appellant down and into a pool rack. Appellant's brother Joe ran across the bar to Fear and began stabbing him with a knife. Fear knocked Joe down and turned back toward appellant.

At this point, Fear was struck by two shots fired from a gun held by appellant. The gun was no more than six to twelve inches from Fear when one of the shots was fired. Fear, who had been stabbed six times before the shooting, fell to the floor and died almost immediately following the second shot.

Appellant fled, using a friend, Peggy Moore, to provide transportation. He was apprehended in the Los Angeles area more than a month after the killing.

PROSECUTORIAL REFERENCE TO APPELLANT'S PREARREST SILENCE

Appellant's defense at trial was that he killed Fear in self-defense. In an effort to discredit this testimony the prosecutor cross-examined appellant about fleeing after the shooting and his failure to contact the authorities. The following exchanges are objected to on appeal:

"Q. [prosecutor] How long had you lived here in the Modesto area, Mr. Free, prior to October 18th?

"A. Since the fifth grade.

"Q. You know where the Police Department is located?

"A. Yes, I do.

"Q. Do you know where the Sheriff's Office is located?

"A. Yes, I do.

"Q. Do you know where the Police Department is located in Riverbank?

"A. No.

"Q. You didn't go to any one of those departments that night but just took off to Sacramento. Is that what you are telling us?

"A. Yes, that is true.

".    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. I see. So you never did go back to your house at Riverbank, then, I take it, on Old Oakdale Road?

"A. No, I didn't.

"Q. Just left everything there and took off down south?

"A. Yes.

"Q. Why?

"A. I was scared. I realized that somebody had been shot in the incident.

"Q. Well, I am talking about, now, your story of two weeks after this shooting took place that you took off. Were you still trembling all this time?

"A. I was still upset, yes.

"Q. For that two weeks?

"A. I am still upset over the thing.

"Q. And you never thought to call anybody and say, 'Hey, it wasn't me'?

"A. All I wanted was away [*sic*].

"Q. To hide?

"A. I just wanted to get away. It wasn't the idea I was trying to hide from anybody. I wanted to get away.

"Q. Why use a phony name, then?

"A. I thought it would be best at the time.

"Q. Why?

"A. I can't say.

"Q. So you send the money to Peggy and she wanted some extra money to pay the girlfriend for the phone bill that she had run up there. Correct?

"A. Correct.

"Q. And, Mr. Free, did you ever tell anyone—Strike that. Did you and Joe talk about it?

"A. Yes, we have.

"Q. And did you ever say to Joe, 'Hey, let's go tell the cops what we were'—quote—'"very cautious of him and scared["]'? Did you ever do that?

"A. Uh-uh.

"Q. Did you ever pick up the phone and call the police and say, 'Hey, that was all an accident'?

"A. No, I did not.

"Q. *Did you ever tell anybody in authority, 'Hey, that was just an accident. I was being very cautious because I didn't like the way he spoke to me'? Did you ever tell them that*?

"A. *I didn't tell anybody about the incident.*

".   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. And then when you left [the bar after the shooting] you didn't say, 'Peggy, make a turn down here and go to the police department and let's find out what happened to this guy'? Is that right?

"MR. WEISS [for the defense]: Argumentative, Your Honor.

"THE COURT: Sustained.

"Q. Did you tell—

"A. No I didn't.

"Q. 'Let's go down and find out what happened'?

"A. No.

"Q. Did you go and tell her 'Let's go down to the police department and tell them it was all an accident'?

"MR. WEISS: Your Honor, this has been covered already. It is asked and answered.

"THE COURT: Sustained." (Italics added.)

An interpretation of the italicized question could be that it was an inquiry about postarrest silence. However, a fair reading of it in context indicates that the examiner, the witness and the trier of fact had their minds on the events after the killing and before the arrest.

We turn our attention to the propriety of cross-examining on pre-arrest silence.

■ Appellant maintains this cross-examination constitutes misconduct in that it penalizes appellant's exercise of his privilege against self-incrimination. (Cal. Const., art. I, § 15.)

Appellant's argument must be rejected because case law indicates that the United States and California Constitutions afford no protectable status to prearrest silence.

*A. The issue is cognizable*

■ There was no trial objection to the cross-examination on the constitutional grounds now urged. Prosecutorial misconduct cannot be raised on appeal absent a specific objection at trial unless any admonition from the trial judge could not have cured the harm done. (*People v. Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].) "[T]he initial question to be decided in all cases in which a defendant complains of prosecutorial misconduct for the first time on appeal is

whether a timely objection and admonition would have cured the harm. *If it would, the contention must be rejected . . . .*" (*Ibid.*, italics added.)

Normally, the issue would be waived. Appellant points out, however, that several hours after the evidence was in, defense counsel made a motion for mistrial citing the Fifth Amendment as well as *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] and *People* v. *Galloway* (1979) 100 Cal.App.3d 551 [160 Cal.Rptr. 914]. The court denied the motion, not on untimeliness, but because the defense attorney did not cite "any cases directly on the point in question." (This is true if we are correct in stating that the focus was on prearrest silence.) Further, the court denied a defense request that the prosecutor be directed not to comment on appellant's silence during argument.[2] We thus discuss the issue on the merits.

### B. Federal cases on prearrest silence

In *Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240], the United States Supreme Court held it was fundamentally unfair to allow an arrestee's silence following *Miranda*[3] warnings to be used to impeach his subsequent exculpatory statements at trial. (At pp. 616-619 [49 L.Ed.2d at pp. 96-98].) The court reasoned that "[s]ilence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every *post*-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." (At p. 617 [49 L.Ed.2d at p. 97], fn. omitted, italics added.)

The basis of the decision is the fundamental unfairness of the government giving the accused *Miranda* warnings and then commenting upon his exercise of his right to remain silent. By informing him of his right against self-incrimination, there is an implicit assurance that a decision to remain silent cannot be used against the accused.

*Doyle* reviewed a state conviction, and was grounded on the Fourteenth, not the Fifth, Amendment. The court referred to the warnings as being a prophylactic means of safeguarding Fifth Amendment rights.

---

[2]There was no defense motion to strike, but such would have been futile, so none was required. The prosecutor did not comment on appellant's silence during argument.

[3]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

(For the distinction between a violation of Fifth Amendment rights and the procedural rules established in *Miranda*, see *Michigan v. Tucker* (1974) 417 U.S. 433, 455 [41 L.Ed.2d 182, 199, 94 S.Ct. 2357] (conc. opn. of Brennan, J.).)

In a case strikingly similar to the instant case,[4] the Supreme Court held that the Fifth Amendment, as applied to the states through the Fourteenth Amendment, is not violated by the use of *pre*arrest silence to impeach a criminal defendant's credibility. (*Jenkins v. Anderson* (1980) 447 U.S. 231, 237 [65 L.Ed.2d 86, 93, 100 S.Ct. 2124, 2129].)

*C. California law on prearrest silence*

Relying on the separate guaranty against self-incrimination contained in article I, section 15, of the California Constitution, appellant urges us to rule a prosecutor may not use prearrest silence to impeach a defendant's credibility.

California law is to the contrary.

*Jenkins v. Anderson* was cited with approval by our Supreme Court in *People v. Redmond* (1981) 29 Cal.3d 904, 910 [176 Cal.Rptr. 780, 633 P.2d 976], when it said: "When a defendant elects to testify in his own defense a comment on his prior muteness does not necessarily violate his privilege against self-incrimination." Although dicta, this is nonetheless persuasive.

*Redmond* did not discuss *In re Banks* (1971) 4 Cal.3d 337 [93 Cal.Rptr. 591, 482 P.2d 215], which reversed for *Griffin* error, but also involved evidence that at the time the defendant was identified by a victim at the robbery scene, he said nothing. He also remained silent when identified at a suggestive lineup. It was held that the accusation stage had occurred in both confrontations, and that the *Griffin* rationale implicitly proscribes drawing an inference of guilt from a failure to respond to an accusatory statement.

Shortly before *Redmond, People v. Burton* (1981) 117 Cal.App.3d 382 [172 Cal.Rptr. 632] was decided. In an action charging defendant

---

[4]In *Jenkins*, as in the instant case, the defendant, accused of murder, claimed for the first time at trial that the killing had been in self-defense. The prosecutor cross-examined the defendant about whether, prior to his arrest, he told the police about the incident.

with a violation of Penal Code section 245, subdivision (a), and in which self-defense was asserted, the prosecutor asked a peace officer whether appellant had come forward to give any explanation about his involvement in the incident. Appropriate objections were made. The appellate panel, relying upon the reasoning in *Jenkins*, held that the question was not error. (At pp. 386-387.) (There was no mention made of the independent force of the California Constitution.)

Both *Jenkins* and *Redmond* were presaged by Justice Grodin in *People v. Martin* (1980) 101 Cal.App.3d 1000 [162 Cal.Rptr. 133]. A reading of the facts in *Martin* suggests the defendant's girl friend gave the testimony regarding defendant's silence in the face of an accusatory question, and the matter was not the subject of cross-examination. The court held that the prosecutor could comment upon the accused's silence in his closing remarks to the jury. Left open was whether cross-examination should be precluded as to prearrest silence. (At p. 1008, fn. 2.)

Appellant relies upon this court's decision in *People v. Galloway* (1979) 100 Cal.App.3d 551 [160 Cal.Rptr. 914]. In that case, defendant was charged with robbery. The defense was alibi. On cross-examination, defendant admitted knowing of being charged with the crime shortly after it occurred. The first time he mentioned the alibi was at trial, four months later. The failure to speak was termed "post-arrest silence." (At p. 560.) We reversed the conviction on the basis of *Doyle*. We are interpreting the questions in the instant case as applying to prearrest silence, so the case is inapposite.

Our Supreme Court's opinion in *People v. Preston* (1973) 9 Cal.3d 308 [107 Cal.Rptr. 300, 508 P.2d 300] is helpful. In it, the court held the defendant's evasive response to certain extrajudicial out-of-custody statements by a codefendant which incriminated both of them was admissible as an adoptive admission, despite defendant's claim that the evidence violated his Fifth Amendment rights. The court stated: "If a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt. [Citations.]" (At pp. 313-314.)

"Defendant urges that the admission of this evidence amounted to an improper comment upon his right to remain silent at the trial, in violation of *Griffin* v. *California* (1965) 380 U.S. 609 . . .; and *People* v. *Cockrell* (1965) 63 Cal.2d 659 . . . . There is nothing in *Griffin* or *Cockrell* which requires rejection of this evidence. Those cases proscribe drawing an inference adverse to a defendant from his failure to reply to an accusatory statement in a situation where failure to reply was based upon his constitutional right to remain silent. The Fifth Amendment privilege against self-incrimination does not on its face apply to commentary on defendant's nonassertive conduct prior to trial, absent a showing that such conduct was in assertion of the privilege to remain silent. (*People* v. *Wilson* (1965) 238 Cal.App.2d 447, 455-461 . . . .) No such showing was made here." (*Id.*, at p. 315.)

From the above, we distill the following California rule: postarrest silence may not be commented upon if it follows a *Miranda* warning. The same rule may apply if there is no *Miranda* warning in order to foreclose inducement of police to dispense with a *Miranda* advisement where they suspect that the arrestee would refuse to talk anyway or where they know that he will, but manipulate the facts by asking no questions immediately after the arrest, in order to use the defendant's silence against him, later giving a *Miranda* warning in order to secure a statement. Although this procedure leads to gamesmanship, it is approved by United States Supreme Court precedent. (*Fletcher* v. *Weir* (1982) 455 U.S. 603 [71 L.Ed.2d 490, 102 S.Ct. 1309].) Prearrest silence may be commented upon unless the court finds the silence was an invocation of Fifth Amendment rights. Prearrest silence in circumstances in which there is no inference of a reliance on the right to silence may be used to impeach by way of cross-examination.

We are not unmindful of cogent arguments in favor of excluding evidence of prearrest silence, both on evidentiary and constitutional grounds.

Evidence of silence " . . . is so ambiguous that it is of little probative force." (*United States* v. *Hale* (1975) 422 U.S. 171, 176 [45 L.Ed.2d 99, 104, 95 S.Ct. 2133, 2136].)

The United States Supreme Court cases of *Doyle, Jenkins* and *Weir* make it clear that the high court relies on the rationale of the inherent

unfairness of advising one he may remain silent but then having the state take advantage of the right.

Historically, California, on the other hand, has relied on the privilege of self-incrimination to preclude reference to silence. (See *In re Banks, supra,* 4 Cal.3d at p. 351.) If the self-incrimination clause is used to preclude reference to defendant's postarrest silence, there is no logical basis to permit reference to defendant's prearrest silence.

There is danger in a rule which requires a defendant to go to the police and tell them that he shot and killed a man, as in this case, in order to avoid his silence being used against him; such impinges on his self-incrimination privilege.

California has been willing to extend its self-incrimination clause beyond that found in the Fifth Amendment. (See, e.g., *People* v. *Disbrow* (1976) 16 Cal.3d 101, 115 [127 Cal.Rptr. 360, 545 P.2d 272]; *People* v. *Pettingill* (1978) 21 Cal.3d 231, 251 [145 Cal.Rptr. 861, 578 P.2d 108].)

Admission of prearrest silence weakens the concept that the state should be made to shoulder the entire load of proving its case.[5]

If California is to establish its own rule in this area, the direction must come from our Supreme Court, which spoke to the contrary in *Redmond.*

### D. Conclusion

There was no constitutional error.

## CLAIMED INSTRUCTIONAL ERROR

■ . Appellant's second contention is that there was evidence he received a blow to the head shortly before shooting Fear and thus it was error for the court not to have instructed the jury on diminished capacity. The instruction was not requested.

---

[5]Further arguments may be found in a law review note at 67 Cal. L. R. 1205.

Uncontradicted evidence established that appellant was the victim of an unprovoked physical attack by Fear, a large, muscular man.[6] One witness testified the victim struck him with enough force "to knock him off his feet and fly him into the pool rack." His nose was split open and profusely bleeding as a result. Appellant further testified that following the blow to the face he "couldn't see straight," he "didn't even have [his] bearings together," that his "knees were shaking" and he was "dizzy"; in short, that Mr. Fear had "knocked [him] stupid."

Nevertheless, appellant was able to testify in detail about the events surrounding the shooting, including the positions of the combatants, their posture, their movements, the firing of the gun, how the victim fell and how appellant effected his escape.

Whether this is substantial evidence of diminished mental capacity demanding a *sua sponte* instruction is a close question.

Appellant maintains his case is on all fours with *People v. Alvarez* (1970) 4 Cal.App.3d 913, 917-919 [84 Cal.Rptr. 732], wherein it was held to be error not to have *sua sponte* given a diminished capacity instruction in a murder trial. In *Alvarez*, the defendant had a gaping, open wound which resulted in his being described by witnesses to the killing as bleeding "very heavy," "like he was drained out ... completely white," "in sort of like a daze," "he didn't seem to be conscious of too much of what was going on around," "[h]e was—just when I seen him walking he was walking around like a zombie, you know, just like he didn't know—like he didn't know what was going on or anything, just walking around in a daze." (At p. 918.) The court held that there was evidence in the record to show that a serious traumatic injury was inflicted upon defendant and evidence sufficient to support an inference of impairment of the defendant's capacity to entertain malice aforethought which required *sua sponte* instruction on the issue. (*Id.*, at pp. 918-919.)

In *Alvarez*, the defendant was able to give testimony regarding the events surrounding the shooting. Points of distinction between the instant case and *Alvarez* include the facts that evidence of bleeding or of the physical damage was not as great in the instant case, and appellant cannot be said to have sustained "serious bodily injury." Further there was no evidence that the appellant appeared "drained out" or "com-

---

[6]Mr. Fear was approximately 6 feet tall and weighed between 210 and 240 pounds.

pletely white," or manifested any physical manifestation of shock or cognitive impairment.

The evidence of appellant's injury and shock were qualitatively and quantitatively different than those suffered by Alvarez. In appellant's case his testimony does not rise to the required level of substantial evidence of diminished capacity needed to trigger a *sua sponte* duty to instruct. (*People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685 [160 Cal. Rptr. 84, 603 P.2d 1]; see *People* v. *Harris* (1981) 28 Cal.3d 935, 957-959 [171 Cal.Rptr. 67a, 623 P.2d 240].)

The judgment is affirmed.

Franson, Acting P. J., and Gomes, J.,* concurred.

A petition for a rehearing was denied May 25, 1982, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied July 22, 1982.

---

*Assigned by the Chairperson of the Judicial Council.