[Crim. No. 7858. In Bank. Nov. 2, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. JIMMIE GENE LUKER and MICHAEL DENNIS LAYNE, Defendants and Appellants.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

Thomas Whelan and Louis S. Katz, under appointment by the Supreme Court, and Gostin & Katz for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jack E. Goertzen, Deputy Attorney General, for Plaintiff and Respondent.

TOBRINER, J. — A jury found Jimmie Gene Luker, Michael Layne, and Thomas Maurice guilty of conspiracy to commit robbery, robbery, and murder in the first degree. It fixed the penalty at death for Luker, but gave life imprisonment to Layne and Maurice. The appeal of Luker is automatic (Pen. Code, § 1239, subd. (b)) ; that of Layne by notice duly filed. Defendant Maurice does not appeal his conviction.

At approximately 10:30 p.m. on Friday, July 26, 1963, a young college student drove into the Union Oil gas station on the access road to Highway 80 in the Mission Valley area of San Diego. He waited for the attendant to appear, then looked around, and eventually entered the rest room, where he discovered the unconscious body of Millard Jackson Phillips. The man lay face up on the floor under the wash basin. Within minutes the police arrived and while searching for clues found a black sweater and a pair of gloves later proved to have been in the possession of defendant Maurice. A few hours later Phillips died without regaining consciousness.

At the joint trial defendant Maurice testified and gave the

following account of the events surrounding the killing. On the day of the murder, he picked up a gun from defendant Layne, then borrowed a car from Ivan Collier. About 10 p.m., he and defendant Luker left the apartment of Joan Kulish and drove to the Union Oil gas station near Highway 80. After the attendant had put some gas into the car, Luker forced him into the station to open the cash register. While Maurice took out the money, Luker ordered the attendant into the rest room. Moments later, as Maurice walked out with the money and opened the car door, he heard a shot ring out. Luker ran out of the station and jumped into the car; Maurice drove off.

During the ride back, Luker said that he had killed the attendant so that there would be no witnesses. The two men drove about and eventually returned to their apartment. They counted the money, and then went to the apartment of one La Verne Lewis, who lived in the same building.[1] After leaving for a few minutes to take back Ivan Collier's car, Maurice returned to Miss Lewis' apartment, had coffee with her and talked for about a half hour. Then Luker and he left the apartment, drove to Ivan Collier's construction shack, and there spent the remainder of the night.

A. *The Appeal of Luker*

Defendant Luker's contentions can be grouped under eight headings: (1) that the testimony of codefendant Maurice was not corroborated; (2) that the court erred in failing to instruct the jury that codefendants Layne and Maurice were accomplices as a matter of law; (3) that the prosecution improperly introduced incriminating statements obtained in violation of *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]; (4) that the court erred in permitting the jury to read newspaper articles about the trial and to listen to radio and television accounts of it; (5) that the prosecution improperly used inadmissible statements of codefendant Layne; (6) that the court erred in overruling defendant Luker's objection to testimony concerning a tattoo of a spoon and hypodermic needle on his arm; (7) that the court erred in admitting the transcript of Miss Lewis' testimony before the grand jury; (8) that error substantially

---

[1]Both Miss Lewis and Miss Kulish occupied separate apartments in a building located at 3952 Iowa Street in San Diego. On July 25, 1963, the day before the murder, Luker and Maurice rented an apartment at the same address.

similar to that committed in *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33], occurred during the penalty trial.

For the reasons set out below we find no merit in defendant's contentions with regard to the guilt phase of the trial. Since, however, the record shows substantial error in the penalty trial we must reverse the judgment as to penalty.

(1) *The corroboration of codefendant Maurice's testimony.*

Section 1111 of the Penal Code provides in part that: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. . . ." As we explain, we find sufficient evidence to corroborate Maurice's testimony.

■ In order to corroborate the testimony of an accomplice the prosecution must introduce independent evidence which of itself connects the defendant with the crime without any aid from the testimony of the accomplice. The amount and type of evidence necessary to produce such corroboration obviously differs according to the circumstances of each case.[2]

■ ■ As we recently stated in *People* v. *Holford* (1965) *ante,* pp. 74, 82 [45 Cal.Rptr. 167, 403 P.2d 423], "The evidence required for corroboration of an accomplice 'need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth; it must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged.' (*People* v. *Lyons* (1958) 50 Cal.2d 245, 257 [324 P.2d 556]; see Witkin, Cal. Evidence (1958) 544-545 and cases cited therein.)"

■ In the present case, the following independent evi-

---

[2]Such evidence does not suffice if "it merely casts a grave suspicion upon the accused." (*People* v. *Robbins* (1915) 171 Cal. 466, 470 [154 P. 317].) On the other hand, the corroborating evidence "may be slight and entitled to little consideration when standing alone." (*People* v. *Wade* (1959) 53 Cal.2d 322, 329 [1 Cal.Rptr. 683, 348 P.2d 116].)

dence tends to connect defendant Luker with the murder of Millard Jackson Phillips:

(1) Miss Kulish testified that Luker and Maurice visited her on the evening of the murder, Friday, July 26th remaining until about 10 o'clock. When the two men left they promised to return in a few minutes. She waited for an hour and then retired for the night but Luker and Maurice failed to appear.

(2) Miss Lewis testified that between 10:45 and midnight of the same evening Luker and Maurice appeared at her apartment. She described both men as being jittery and nervous. When they heard an outside noise Luker told her to look to see if it was the police. She questioned him about this behavior and he replied, ''Well, if anything happens in San Diego we'll be one of the first to be picked up and questions [*sic*].'' Both men told Miss Lewis to tell the police or anyone else who was looking for them that they had not been there. After Maurice had been in the apartment only a few minutes, he left, but returned in a short time.[3] About a half hour after their arrival, Luker and Maurice departed.

(3) Ivan Collier testified that on Saturday morning, about 6:30 a.m., he went to his construction shack and there saw Maurice. He also observed another person in the shack who resembled defendant Luker.[4]

(4) Miss Lewis testified that about 11:30 a.m. of the same morning, Luker and Maurice came back to her apartment for coffee. Luker asked her to call the bus depot because he wanted to leave for Houston. She tried to discourage him from leaving because she knew that he was obliged to remain in San Diego on parole. Eventually, Luker himself called the depot and inquired about the cost of the fare to Houston for two people. Miss Lewis testified that both men were dirty and unshaven and that they told her they had not stayed in their apartment the previous night but had slept on the floor of a rundown shack.[5]

(5) Miss Carol Petersen testified that she saw Luker, Maurice, and Layne together on Tuesday, July 30th. The

[3]Presumably at this point Maurice returned Ivan Collier's car. Collier testified that Maurice handed him the car keys about 11:15 p.m. on the night of the murder.

[4]Prior to the trial, Collier told Officer Schwalbach that he merely had heard a noise in the rear of the shack but had not actually seen anyone other than Maurice.

[5]Helen Zounes, another tenant in the Iowa Street apartment, testified that Luker told her that he had been away from his apartment all Friday evening and had not returned until 6 a.m.

three men had become involved in a fight over some liquor that had been taken from her home. She also testified that she overheard Maurice say to Luker. "If I fink on you, I fink on myself." When Maurice and Layne left, Luker told Miss Petersen that he feared that the two men would come back with a gun. She then told Luker that Maurice had showed her a gun; Luker replied, according to her, that "he'd better go get it before Tommy did, he had it stashed in his mother's house, or mother's garage." Luker again told Miss Petersen that he wanted to "take care of Tommy" since "he knew too much."[6]

(6) Agent De Bruler of the Federal Bureau of Investigation testified that he questioned Luker after arresting him in Florida and that Luker denied knowing Maurice and Layne, although later he indicated he knew that both men had records.

(7) Luker himself took the stand and stated that after he had spent the evening of the murder at his mother's house until 11 p.m., he returned to his apartment. He disclaimed any association with Maurice that evening.

The above recited evidence establishes a sufficient basis upon which the jury could have found Luker's implication in the robbery-murder; the evidence therefore sufficiently corroborates the testimony of Maurice. Such nonaccomplice testimony shows that both immediately before and after the crime Luker and Maurice were together, the police found at the scene of the crime a sweater last known to be in the possession of Maurice, Luker lied as to his whereabouts on the evening of the murder, Luker demonstrated fear and nervousness immediately after the time of the commission of the crime, Luker expressed a desire to leave San Diego for Houston the morning following the perpetration of the crime, Luker told Carol Petersen that he had stashed the gun, Luker did leave San Diego on August 6th thereby violating his parole and forfeiting the money he had paid for rental for some 18 days, and Luker lied to Agent De Bruler about his acquaintance with codefendants Maurice and Layne. Viewing all the above evidence in its totality, we must conclude that the prosecution adequately sustained its burden under Penal Code section 1111 of introducing nonaccomplice evidence

---

[6]Miss Petersen also testified that Luker attempted to enlist her in a forgery scheme and that "he said he would back me up and that if anyone caught me he would blow his head off and they wouldn't feel a thing." As defense counsel notes, Miss Petersen made no mention of these statements at her pretrial interviews with the police.

which "shall tend to connect the defendant with the commission of the offense; . . ."

2. *The failure of the court to instruct the jury that co-defendant Maurice was an accomplice as a matter of law.*

█ We explain that although the court erred in not instructing the jury that Maurice was an accomplice as a matter of law, such error did not cause prejudice in the instant case.

In *People* v. *Robinson* (1964) 61 Cal.2d 373, 393-395 [38 Cal.Rptr. 890, 392 P.2d 970], we held that a codefendant becomes an accomplice as a matter of law if the evidence clearly shows his guilt; that it is error therefore for the court to invite the jury to speculate upon whether the codefendant is in fact an accomplice. "By telling the jury that corroboration of his [codefendant's] testimony was required only if they found him to be an accomplice, the court impliedly and erroneously authorized the jury to find him *not* an accomplice, thereby making corroboration unnecessary. The fact that the court may have, thereafter, given either a proper or an improper definition of accomplice does not cure the error." (*Id.* at p. 394.)

In *Robinson* the error caused demonstrable prejudice. We pointed out that one of the defendants, Guliex, who gave a binding confession, must, if believed, have been an accomplice and guilty. Yet the jury did not reach a guilty verdict as to him. "In his case, some of the members of the jury must have accepted the trial court's invitation, and determined that Guliex was not an accomplice. By the same token, it may have determined that Hickman [another codefendant] was not an accomplice, and that therefore his testimony implicating his codefendants needed no corroboration." (P. 395.)

We can find no such incidence of prejudice which followed in the wake of the erroneous instruction in the instant case. The jury convicted Maurice, Layne and Luker. We do not have the slightest ground for concluding that the instruction confused the jury. The jury must necessarily have determined that all three defendants were accomplices. We may properly assume that the jury followed the court's instruction that it find corroboration before accepting the testimony of one defendant against another.

(3) *The introduction of statements allegedly obtained in violation of defendant's constitutional rights.*

Defendant contends that the prosecution introduced incriminating statements improperly elicited from him on three different occasions: (1) those he gave on August 15, 1963,

to the F.B.I.; (2) those he gave on August 24th to the San Diego police; (3) those he gave on August 25th to the San Diego police. None of these, however, provide grounds for reversal.

█ (1) As to the statements which defendant made to the F.B.I., the record discloses that the agents advised Luker on two occasions that he had a right to remain silent, a right to an attorney, and that anything that he said could be used against him. In spite of these warnings, defendant spoke with Agent De Bruler. Defendant denied committing any murder; he said that although he did know a "Tom" with whom he had been in prison he knew of no one by the name of Thomas Maurice or Michael Layne. He stated that he met "Tom" while in San Diego between July 24th and the date he left for Houston. When told that he was implicated in an armed robbery with Maurice and Layne, Luker replied that: "he didn't see how anyone could take the word of two people who had previously served time." In view of the warning as to his constitutional rights, the court properly received the above statements in evidence against Luker.

█ (2) In the course of returning from Florida to California on August 24th, Sergeant Hoobler and Lieutenant Schenck engaged Luker in a conversation. In substance, Luker told the officers that he was not involved in the crime; that he had not been present with Maurice at either Miss Kulish's or Miss Lewis' apartment the night of the murder but had been at his mother's home for dinner. When told of Carol Petersen's statement that he had stashed a gun in his mother's garage, Luker replied, in the words of Sergeant Hoobler, that "he could think of a lot better place to hide the gun and he asked why he would hide it there."

Pursuant to *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], we have said that when "the officers have arrested the suspect and the officers have undertaken a process of interrogations that lends itself to eliciting incriminating statements, the accusatory or critical stage has been reached and the suspect is entitled to counsel." (*People* v. *Stewart* (1965) 62 Cal.2d 571, 577 [43 Cal.Rptr. 201, 400 P.2d 97].) At the time defendant uttered the above statements he was under arrest. The record does not clearly disclose whether or not the officers had then begun a process of interrogations that lent itself to eliciting incriminating statements. █ When a record, however, reveals that the defendant has been arrested, has therafter been questioned about

the offense which occasioned the arrest, and no evidence indicates that the statements are in the nature of spontaneous disclosures, we do not presume that such a process of interrogations has not been undertaken. (*People* v. *Andrews* (1965) 234 Cal.App.2d 69 [44 Cal.Rptr. 94]; *People* v. *North* (1965) 233 Cal.App.2d 884 [44 Cal.Rptr. 123].) ▮ Accordingly, the circumstances of this case indicate that the accusatory stage had been reached and that Luker was entitled to counsel.

Before Luker gave the above statements he stated that he did not wish to talk until he had contacted his attorney. Despite this request, the officers continued to question him. In *People* v. *Anderson* (1965) *ante,* p. 351 [46 Cal.Rptr. 763, 406 P.2d 43], we said: ". . . the request [for counsel] does not lose its force because the questioning continued. The denial of the right to counsel by evasion or neglect of the suspect's request for counsel constitutes no less a constitutional violation than a denial by explicit rejection." (*Ante,* p. 362.) Consequently, the statements obtained as a result of the above inquiry should not have been admitted into evidence under *Escobedo* v. *Illinois, supra,* 378 U.S. 478. For the reasons discussed below under (3), however, we find that such admission caused defendant no prejudice.

(3) On August 25, 1963, immediately before boarding the plane to California, Luker again made certain statements to the officers. The record does not disclose whether or not the officers warned him of his rights at this time or whether they had begun to undertake a process of interrogations. In substance, Luker asked the officers about the penalty for "a crime of this type," about the average time spent in prison for one who received life imprisonment, and whether the courts would show any leniency toward the person who did not actually do the shooting.[7] At this point, the conversation ended and the officers and defendant boarded the plane.

During the flight, Luker theorized about the case and explained that he could not understand how the sweater was found at the scene in a buttoned condition, nor why Miss Petersen should have said that he had stashed the gun in his mother's garage. After further discussion, Luker said that he had spent the evening of the 26th with his stepfather and his mother and

[7]On direct examination, Sergeant Hoobler testified that Luker had asked about leniency toward the person who did the shooting. On cross-examination, he admitted that his former statement had been incorrect and that Luker had actually asked about a person who did not do the shooting.

sister, and that when his stepfather drove him back to his apartment it was after dark but he was not sure of the exact time. Then, later, en route from the Los Angeles air terminal, Luker commented on the possibility of doing only 12 years time before receiving parole on a life sentence for murder.

Although the statements detailed above in (2) and (3) appear to have been improperly elicited, they do not constitute confessions; we must therefore, in the light of the entire record, determine whether the statements caused defendant prejudice. (*People* v. *Hillery* (1965) 62 Cal.2d 692 [44 Cal.Rptr. 30, 401 P.2d 382].) Since defendant's testimony presented to the jury the substance of his statements to the officers, and since the devastating testimony of Maurice so deeply involved him in the crime, we cannot believe the erroneous admission of these remarks could have caused prejudice. Whether we view the record in light of *People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243], or *Fahy* v. *Connecticut* (1963) 375 U.S. 85 [84 S.Ct. 229, 11 L.Ed.2d 171], we find no prejudice in this case.

(4) *The trial court's instruction permitting the jury to view news media reports of the trial.*

 We find no prejudice in the fact that prior to the reception of evidence, the trial judge erroneously told the jurors that they might, if they wished, view telecasts, read newspapers, or listen to radio accounts of the trial proceedings, but that it was their duty not to let these reports affect their deliberations.

In *People* v. *Lambright* (1964) 61 Cal.2d 482 [39 Cal.Rptr. 209, 393 P.2d 409], we held such an instruction to be erroneous. In *Lambright,* a murder prosecution, the trial judge excluded as hearsay the evidence of a death threat which the defendant had levelled at the victim shortly before her death. Subsequently, the local press reported the incident. Since the trial court permitted the jurors to read newspapers during the trial we recognized the strong possibility that some of the jurors improperly learned of the inadmissible death threat. Because the evidence which was thus placed before the jury, via the newspapers, related directly to motive, the main issue in the case, and because this type of evidence would leave an indelible impression upon the minds of the jurors, we reversed.

In the case presently before us the press reported no such damaging evidence. In a supplemental brief defendant calls our attention to a news article which reveals that defendant's

476

stepfather failed to testify because he had been stabbed by his 16-year-old stepson.[8] At the trial, the court excluded any evidence of this incident. The possibility that the jury may have nevertheless gained knowledge of the stabbing through the newspapers does not, however, bring the present case within the ambit of *Lambright*. Unlike the reported evidence in *Lambright* which bore directly on a central issue in the case, the incident reported here relates only to a collateral matter and does little, if any, harm to Luker's cause. Consequently, the error of the trial court in failing to direct the jury not to read news accounts of the trial caused defendant no prejudice.

(5) *The introduction of extrajudicial statements of codefendant Layne against Luker.*

Luker's contention that the prosecution in its closing argument improperly quoted extrajudicial statements of codefendant Layne does not aid him. Such statements of Layne, of course, cannot properly be admitted against Luker (*People* v. *Roberts* (1953) 40 Cal.2d 483 [254 P.2d 501]); an admission by one coconspirator after he has been apprehended does not in any sense further the criminal enterprise, but rather frustrates it. Consequently, as hearsay evidence, it must be excluded against the fellow conspirators. (See *People* v. *Roberts, supra,* at p. 489.)

A careful examination of the record, however, reveals that the prosecutor argued to the jury from evidence presented not only through the extrajudicial statement of Layne, but also through his testimony at trial. While on the stand Layne testified that he spoke with Maurice concerning the whereabouts of the gun and that Maurice said that the gun could not be retrieved. Layne then testified that Luker told him, "the same thing Maurice had," that "they had trouble. They had to lose the gun." In view of this testimony, the prosecutor's error in quoting approximately the same material from Layne's extrajudicial statement caused no prejudice to Luker.

(6) *The testimony concerning the tattoo on Luker's arm.*

Luker contends that the trial court improperly over-

---

[8]The newspaper article reported as follows: "Goetschius [the defendant's stepfather] is in critical condition at Hillside Hospital with five stab wounds, four in the back and one in the side, inflicted by his 16-year-old stepson Friday night, police said. Police said the youth, Ronald Charles Ingraham, a California Youth Authority parolee, admitted stabbing Goetschius after an argument."

ruled his objection to testimony of Agent De Bruler of the F.B.I. regarding the presence of "a tattoo on his upper left forearm which was a crude tattoo of a spoon and a hypodermic needle." Later in the trial, both the prosecutor and counsel for defendant Maurice commented on the presence of this mark as tending to show that Luker indulged in narcotics. Accepting the contention that the irrelevancy of this item of evidence to the case against Luker rendered it inadmissible, we must nevertheless conclude that in the light of the other overwhelming evidence against him it could have effected no prejudice.

(7) *The introduction of the transcript of the grand jury testimony of La Verne Lewis.*

 We do not believe that the introduction into evidence of the transcript of Miss Lewis' testimony before the grand jury constituted prejudicial error. At the trial, counsel for the defendant attempted to impeach Miss Lewis by showing that her trial testimony deviated from the story which she had previously given the police. Subsequently he introduced into evidence the entire account of her statements to the police. In order to rebut this charge of recent fabrication the prosecution offered the grand jury transcript of her testimony. Assuming that the trial court should have excluded such evidence, defendant fails to show that its introduction caused him prejudice.

(8) *The error committed in the penalty trial.*

 Error substantially similar to that in *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33], occurred during the penalty phase of defendant's trial. The record shows that the prosecutor argued to the jury that life imprisonment "doesn't really mean life imprisonment"; that whether or not defendant would be paroled lay in the hands of the Adult Authority; that the Governor could commute the life sentence to any particular years or could even grant a full pardon. The prosecutor then argued that if the jury brought in the death penalty, the trial judge, as well as the Governor, could reduce the penalty to life imprisonment. The trial judge instructed the jury in virtually the identical words condemned in *Morse, supra.* Because of the substantial deviation from the standards established in *People* v. *Morse, supra,* we must reverse the penalty judgment. (*People* v. *Hines* (1964) 61 Cal.2d 164, 170 [37 Cal.Rptr. 622, 390 P.2d 398].)

B. *The Appeal of Layne.*

■ Since the statements elicited from defendant Layne on August 14th at the police station and introduced against him over objection deprived him of his right to counsel under the rule of *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *People* v. *Dorado* (1965) 62 Cal.2d 350 [42 Cal.Rptr. 169, 398 P.2d 361], we must reverse the judgment as to him.

The record discloses that on August 14, 1963, police officers apprehended Layne and brought him into custody. Prior to answering any questions, Layne asked to see a lawyer. The officers interrogating him, however, ignored his request and continued their questioning for about an hour and ten minutes. They then called in a police stenographer and had the defendant repeat his statements in her presence. At the trial, the prosecution introduced into evidence both the testimony of the interrogating officer and the stenographic record.

In substance the statements thus elicited indicated that Layne had taken a .32 caliber revolver from Jesus Romo to satisfy a debt that Romo had not paid; that on July 25th he gave this gun to Maurice, who he knew "had a caper lined up to do" and "wanted the gun to do it"; that to Maurice the caper "looked pretty good and he was going to try it and he would contact me afterwards to straighten me for loaning the pistol to him and would give it back to me at that time"; that he expected to get at least $50 in return; that on Sunday, July 28th, he went over to the Iowa Street apartment "to find out what happened and to collect"; that Maurice told him that he had run into some trouble and "had to lose the weapon—stash it permanently. It couldn't be retrieved. It couldn't be gotten back because they had a hassle."

Prior to arresting Layne, the police had obtained a confession from Maurice alleging that Layne had supplied the murder weapon. Thus suspicion had focused on Layne. The nature of the questioning shows that the officers had undertaken a process of interrogations which tended to and in fact did elicit incriminating statements. Accordingly, the accusatory stage had been reached, and defendant was entitled to counsel. (*People* v. *Stewart* (1965) 62 Cal.2d 571 [43 Cal. Rptr. 201, 400 P.2d 97].) The police authorities, however, failed to advise defendant of his constitutional rights to remain silent and to counsel. Indeed, they ignored his express request for counsel and continued their interrogation. Since

the ''denial of the right to counsel by evasion or neglect of the suspect's request for counsel constitutes no less a constitutional violation than a denial by explicit rejection,'' the admission of the statements thereby obtained constituted error. (See *People* v. *Anderson, supra, ante,* pp. 351, 362.)

Whether Layne's statements amounted to a full confession or merely an admission, they clearly furnished the principal evidence to support Layne's participation in the conspiracy. Since Layne was not present at the scene of the crime, the only basis for his conviction is the allegation that he gave the murder weapon to Maurice, expecting that it would be used for a ''caper.'' Aside from Layne's own statements, the only evidence connecting him with the robbery-murder consists of the accomplice testimony of Maurice, which, without Layne's statements, stands uncorroborated.

The People concede that the statements improperly elicited from Layne formed the ''heart'' of the evidence against him, but contend that they caused him no prejudice since he took the stand and virtually repeated them. This argument overlooks the fact that, if the prosecution had not introduced the incriminating statements, Layne would have had no need to attempt to explain them; in all probability he would not have testified. ''When defendant testified, however, the only substantial evidence that had been introduced connecting him with the crime was his statement. . . . His testimony was therefore impelled by the erroneous admission of that evidence and cannot be segregated therefrom to sustain the judgment.'' (*People* v. *Davis* (1965) 62 Cal.2d 791, 796 [44 Cal.Rptr. 454, 402 P.2d 142]; cf. *People* v. *Bilderbach* (1965) 62 Cal.2d 757 [44 Cal.Rptr. 313, 401 P.2d 921].) The erroneous introduction of Layne's incriminating statements caused prejudicial error, and accordingly we must reverse the judgment against him.

The judgment against Layne is reversed. The judgment against Luker is reversed as to the death penalty but is affirmed in all other respects.

Traynor, C. J., Peters, J., Peek, J., concurred.

BURKE, J., Concurring and Dissenting.—I concur in the affirmance of the judgment of guilt as to defendant Luker since I am not of the opinion after ''an examination of the entire cause, including the evidence'' (as mandated by § 4½, art. VI, of the Cal. Const.), that it is reasonably probable

that a result more favorable to the defendant Luker would have been reached in the absence of the errors set forth in the majority opinion. (See *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

I concur also in the judgment reversing the conviction of defendant Layne for the reason that after my examination of the entire cause under section 4½, article VI, I am of the opinion that it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the errors set forth in the majority opinion.

I dissent from the reversal of the judgment imposing the death penalty on the defendant Luker. This was a cold-blooded, wanton, totally unprovoked murder accomplished in the perpetration of an armed robbery, and from my examination of the entire cause under the aforementioned article of the Constitution I am not of the opinion that it is reasonably probable that a result more favorable to the defendant Luker would have been reached in the absence of the errors set forth in the majority opinion. By the unequivocal mandate of our Constitution I am, therefore, compelled to vote to affirm the judgment in its entirety as to defendant Luker. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836; see also dissenting opinions of Mr. Justices White and Schauer in *People* v. *Terry,* 57 Cal.2d 538, 569, 572 [21 Cal.Rptr. 185, 370 P.2d 985]; of Mr. Justice Schauer in *People* v. *Hillery,* 62 Cal.2d 692, 714 [44 Cal.Rptr. 30, 401 P.2d 382]; and dissenting opinions in *In re Spencer, ante,* pp. 400, 414 [46 Cal.Rptr. 753, 406 P.2d 33]; *In re Gaines, ante,* pp. 234, 240 [45 Cal.Rptr. 865, 404 P.2d 473]; and *In re Lessard,* 62 Cal.2d 497, 513 [42 Cal.Rptr. 583, 399 P.2d 39].)

McComb, J., and Schauer, J.,* concurred.

The petition of appellant Luker for a rehearing was denied December 1, 1965. Schauer, J.,* sat in place of Mosk, J., who deemed himself disqualified.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.