[Crim. No. 12538.   Second Dist., Div. Four.   June 25, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. JOHN PATRICK COYNE, Defendant and Appellant.

446

Frank Duncan for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Philip M. Rosten, Deputy Attorney General, for Plaintiff and Respondent.

FILES, P. J.—In a trifurcated trial a jury found defendant guilty of murder in the first degree (Pen. Code, §§ 187, 189) and sane, and fixed the penalty as life imprisonment. This is defendant's appeal from the judgment. It is necessary to reverse the judgment because defendant's extrajudicial statements were obtained in violation of the rules announced in *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361] ; *People* v. *Anderson* (1965) 63 Cal.2d 351 [46

Cal.Rptr. 763, 406 P.2d 43] and *People* v. *Luker* (1965) 63 Cal.2d 464 [47 Cal.Rptr. 209, 407 P.2d 9].

## Facts

In the latter months of 1964 defendant and the victim, Agnes Theresa Wallace, lived together in an apartment in Long Beach. Defendant was married to another woman from whom he had been separated for 17 years. On December 24, 1964, defendant and Mrs. Wallace and a mutual friend, Albert Gill, spent most of the afternoon and evening drinking Scotch whiskey. According to Gill, at about 7 p.m. defendant was "loaded," but by midnight he had sobered up pretty well. Then they attended a midnight mass. Afterward, Gill drove defendant and Mrs. Wallace to their apartment and left them. Except for defendant, Gill was the last person to see Mrs. Wallace alive.

On December 29, 1964, Long Beach Police Officer Robertson found Mrs. Wallace's body in the bathtub of her apartment. A kitchen knife, with rosary beads draped about it, was embedded in her back, while scissors protruded from her throat. The autopsy surgeon found eight stab wounds in the victim's neck and 14 in her back. A laboratory test of her blood showed no alcoholic content. The body was well preserved because of the weather and the lack of heat in the apartment; and the surgeon was unable to offer any opinion as to the time of her death.

Defendant was taken into custody in Guadalajara, Mexico, and on March 3, 1965, was questioned there by Long Beach Officer Robertson, in the presence of Mexican officers. This conversation was tape-recorded. Defendant told Robertson about the events of December 24, and stated that after he and Mrs. Wallace had returned to their apartment she had told him she intended to leave him and go away with Gill. They had a cup of tea and then went to sleep in separate beds. Defendant said they arose about 6 a.m., she told him again that she was leaving, there was no argument, he packed his belongings and left. He denied that he had killed her.

Mexican authorities took defendant to Laredo, Texas, and released him. He was rearrested in San Antonio, Texas, where he was questioned again by Officer Robertson for about two hours in the evening of April 5. No recording of this was made. Shortly after midnight there was a further interview which Officer Robertson recorded in typewriting. Defendant's signature appears at the end of the document.

In the typewritten document defendant states that when he and Mrs. Wallace returned to the apartment after mass he was drunk; they had tea and went to bed. The document states:

"We got up the next morning. I am not too sure that is when I killed her.

"Q. Is there any doubt in your mind that you did this?

"A. No. She went to the bathroom.

. "

"I don't really remember what happened. I was still intoxicated at the time. We drank quite a bit of whiskey. It leaves me without any recollection of what has happened. I left and had several drinks of Scotch, one bar was on Broadway, one on Seventh and others I don't remember. I had a beer in one place on Broadway then I went downtown. A couple of hours later I returned to the apartment. I had the key, her key. I went in and used the toilet and there she was in the tub. I covered her head with a towel. I put the statue that was on top of the T.V. on the towel over her head. I got some cigarettes from the kitchen and then I left again.

"Q. If you don't remember doing this, how do you know that you did when you returned later on?

"A. On account of the knife and all. I was a great knife man in Korea."

During the day of April 6 defendant was returned to Long Beach. On April 7 defendant was questioned by Officer Robertson and three other Long Beach officers, and a tape recording was made. In this April 7 interview defendant said he remembered that after they arose on December 25, Mrs. Wallace went into the bathroom and he followed her. He remembered hitting her and the next thing he remembered he was leaving. He did not remember anything in his hand at the time he hit her. He went out, had some drinks, visited a former landlady, and returned to the apartment. Then he found her dead in the bathtub. He said he must have done it because he was a great knife man in Korea. After that he took a bus to San Diego.

Defendant, testifying on his own behalf at the guilt trial, said that on the morning of December 25 after Mrs. Wallace told him she was going away with Gill, his next recollection was leaving the house about 7 or 7:30 and going to a bar for a drink. Mrs. Wallace was then still alive. He still felt drunk from the night before. He did some drinking in bars, called on his former landlady, and then returned to the apartment,

where he found Mrs. Wallace in the bathtub. He covered her head with a towel and put a religious statue on it. He testified: "Q. Were you afraid you might have killed her? A. The possibility crossed my mind."

### Diminished Capacity

One of the issues raised at the guilt trial was defendant's capacity to harbor the state of mind which is an element of the offense of murder. Both sides presented expert medical testimony.

Dr. Marinacci, called by the defense, testified that he examined the defendant by making an electroencephalogram, both before and after the defendant had ingested alcohol. Before alcohol was given, the tracings indicated brain damage. After the consumption of alcohol, the tracings indicated abnormality in other parts of the brain, particularly the temporal lobe which controls behavior. Dr. Marinacci testified, "This man has a true pathology in the brain. It is nothing you can argue over. This man had something wrong with his brain, and alcohol will make him berserk." He explained that one characteristic of such a person is that afterwards the person does not remember anything.

Three psychiatrists, Doctors Gore, Tweed and Davis, called by defendant, testified, upon the basis of Dr. Marinacci's findings, and their own examinations of the defendant, that on the morning of December 25, 1964, defendant was in a fugue or clouded state, incapable of premeditation or deliberation. Such a person acts in the manner of an automaton and may be able to do many things which we normally do with full consciousness, but without any knowledge of what he is doing, and without any ability to recall it afterwards. That condition, according to the opinion of those witnesses, was the effect of alcohol upon a diseased brain.[1]

All three of the defense psychiatrists conceded that their conclusions were based upon the assumption that defendant was under the influence of alcohol at the time in question, and that they had relied entirely upon defendant's own statements for that crucial fact, and that their opinions would be different if defendant was not under the influence.

---

[1] In the sanity trial Dr. Davis testified that defendant was legally insane at the time of the offense. It was stipulated that Doctors Gore and Tweed would also say that defendant was legally insane, for the same reasons given in their testimony at the guilt trial. All of the psychiatrists were of the opinion that defendant was not insane at the time of the trial.

Dr. McNiel, a psychiatrist called by the People, expressed the opinion that on December 25, 1964, defendant was capable of premeditation and deliberation and had the ability to form the intent to commit murder, even though intoxicated.[2]

In instructing the jury at the close of the guilt trial, the court explained to the jury the difference between first degree murder, second degree murder and voluntary manslaughter, as defined in the Penal Code. This case was tried before the decision of the Supreme Court in *People* v. *Conley* (1966) 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911], and thus the trial court did not have the benefit of that opinion, which holds that a person whose capacity to harbor malice is impaired by mental disease, defect or intoxication may be guilty of voluntary manslaughter, even though the killing was intentional, premeditated and unprovoked.

■ The failure of the trial court to give the kind of instruction on voluntary manslaughter specified in the *Conley* opinion is error. (See *People* v. *Aubrey*, 253 Cal.App.2d 912 [61 Cal.Rptr. 772].)

### Extrajudicial Statements

The People offered in evidence the testimony of Officer Robertson concerning the interview at Guadalajara, the type-written statement made at San Antonio, and the April 7 interrogation in Long Beach. Before receiving this evidence the trial court conducted a hearing outside the presence of the jury, listened to the tape recordings,[3] and heard the testimony of defendant. The court then ruled that each of the statements was voluntary and that defendant had waived his right to counsel at the time he made each statement. It is necessary to analyze certain aspects of the evidence upon which those findings were made.

Defendant did not at any time deny that he had made the statements imputed to him. Defendant conceded that Officer Robertson had neither used force nor threatened it at any time. Defendant testified that a San Antonio officer had threatened him, but that officer, testifying in rebuttal, denied it. Defendant testified that when questioned in San Antonio he was very much upset and confused; that Robertson would say,

---

[2]At the sanity trial Dr. McNiel testified that defendant was legally sane at the time of the offense; and it was stipulated that Dr. Crahan, who had examined defendant, would also testify that defendant was sane.

[3]The tapes themselves were marked for identification but not played for the jury. The members of this court have listened to the recordings in order to review all that the trial court had before it in ruling upon the question of admissibility of the officer's testimony.

" 'This is the way it happened, isn't it,' " and that he would agree. Defendant gave no testimony whatever concerning the Long Beach interrogation.

All three of the extrajudicial statements are generally consistent with each other and with the circumstances shown by the other evidence in the case, and with defendant's court testimony. In none of defendant's statements did he ever admit having any recollection of stabbing the deceased. What defendant told Officer Robertson is incriminating, not merely because defendant expressed the belief that he had done the killing, but because these statements are the only evidence which placed defendant at the scene at about 7 a.m. on December 25, and again about two hours later, at which time he found the body. Defendant is the only person who said that the killing occurred in the morning of December 25.

This case was tried prior to the decision in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.2d 974]. Hence the admissibility of defendant's statements is governed not by the *Miranda* test, but by the less restrictive rules set forth in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758] and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. (*People* v. *Rollins* (1967) 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].)

■ Under the *Escobedo-Dorado* rules, "when the officers have arrested the suspect and the officers have undertaken a process of interrogations that lends itself to eliciting incriminating statements, the accusatory or critical stage has been reached and the suspect is entitled to counsel." (*People* v. *Stewart* (1965) 62 Cal.2d 571, 577 [43 Cal.Rptr. 201, 400 P.2d 97].)

The record shows without contradiction that Officer Robertson advised defendant of his right to counsel and his right to silence at the beginning of their recorded conversation in Guadalajara, and again at each of the other occasions when defendant was questioned. Insofar as warning is required by the *Escobedo-Dorado* rules, there was compliance. ■ The real question is whether the evidence supports the trial court's finding that defendant waived his right to counsel.

The Guadalajara tape shows that following some preliminaries, the officer commenced his interrogation thus:

"Q. . . .First of all, I want to tell you your rights. Your rights when you are talking to me are the same as if I were talking to you in Long Beach. You don't have to talk to me if

452

you don't want. You're entitled to the services of an attorney if you want one. Anything you tell me I may use to testify against you. You understand that?

"A. Yes, sir.

"Q. Do you want to talk about it?

"A. No, sir. I think I'd better talk to an attorney considering the matter that this is involving.

"Q. I'll ask you this. Did you kill Agnes Wallace.

"A. No.

"Q. Are you interested in helping us find out who did kill her?

"A. Yes.

"Q. If you are interested why wouldn't you care to talk to us about it now?

"A. Well, sir, I don't know anything about this procedure and I think it would be for my own protection to talk to an attorney first.

"Q. Are you in custody here?

"A. I have been ever since Saturday.

"Q. What are you in custody here for? I mean what were you arrested here for?

"A. Nobody told me. They just told me they were holding me for the Long Beach police. . . .

"Q. Well, we had a circular out looking for you to talk to you regarding this. That's what I came down here for, just to talk to you regarding it. I don't have a warrant for your arrest. Uh, we're trying to find out who killed Agnes Wallace.

"A. I'll tell you anything I possibly can if it would help."

The interrogation proceeded as defendant answered questions concerning the events of December 24 and the early morning of the 25th, as well as some background information about defendant's relationship with the deceased. Then the questioning became accusatory in form, leading up to this:

"Q. Yeah. And I think you killed her.

"A. No I didn't.

"Q. Would you be willing to take a polygraph examination on that?

"A. I won't do anything further, sir, until I have seen a lawyer.

"Q. Why wouldn't you do anything further? You've been doing fine so far, up until the time she was killed.

"A. I don't know, sir. I don't know anything about the law. I have never been in this kind of predicament before.

"Q. Well, you are in this kind of predicament now."

The questioning progressed over other subjects with answers given freely until this:

"A. I don't know nothing about it, sir.

"Q. Well, I think you do know quite a bit about it. I forget what you answered about taking a lie detector test.

"A. I couldn't.—I've got to see a lawyer, sir.

"Q. If you know nothing about it why do you fear taking a lie detector test? All it will do is tell whether you are telling me the truth or whether you are not.

"A. I'd better see a lawyer, sir.

"Q. A lawyer can't tell you what's the truth and what's the truth [sic]. You're the only one who knows what's the truth.

"A. I'd rather see a lawyer, sir.

"Q. Do you have a lawyer?

"A. No.

"Q. Do you have means for obtaining a lawyer.

"A. As soon as I get my check I will."

The interrogator pressed on, but the session concluded soon after with this:

"A. I don't know nothing.

"Q. I tell you, Coyne, you might as well tell me about it—sooner or later—the sooner is the best—now is the time to get this thing done with—

"A. I'd better see a lawyer. . . .

"Q. Well, okay, you are entitled to by all means. So, we'll let it go at that for now, then. I'll see you later."

There is no tape recording of the San Antonio conversations which took place during the night of April 5 and early morning of April 6. These were conducted by Officer Robertson in the presence of Lieutenant Slocum and Detective Morris of the San Antonio Police Department. Officer Robertson testified that in the first conversation on April 5 he informed the defendant that he did not have to talk, that he was entitled to the services of an attorney, and that anything he said would be used against him. The officer also testified:

"Q. . . . At any time in this one or two hours, did the defendant mention a lawyer?

"A. Yes, he did.

"Q. What did he say?

"A. He said that he would—he said, 'I think I had better talk to a lawyer,' or words to that effect, 'first.'

"Q. All right. What did you say, if anything?

"A. Continued my talking to him.

"Q. You just ignored him?

"A. I asked him if he had a lawyer. He said, 'No.'"

Later the court interrogated Officer Robertson:

"THE COURT: What did you say to him when he said he thought he should get a lawyer?

"THE WITNESS: I didn't make any direct statement in regard to it.

"THE COURT: Did you answer that statement at all?

"THE WITNESS: No, sir.

"THE COURT: You asked another question?

"THE WITNESS: Yes.

"Q. By MR. TRAMMELL: As best you recall, anyway, was the next question pertinent to the facts surrounding the killing?

"A. Yes, sir.

"Q. Did he answer that question?

"A. Yes, sir."

Defendant testified that while Officer Robertson was out of the room he asked Lieutenant Slocum about a public defender. Slocum replied that they had no such system there. Lieutenant Slocum, when called as a witness by the People, confirmed that this conversation had taken place.

The purpose of requiring that the prisoner be advised of his right to silence and his right of counsel is to enable him to exercise a free choice. When the interrogator gives the prisoner to understand that the questioning will be pursued irrespective of the prisoner's choice, the advice may fail to accomplish the objective of the rule. It is true, as the Attorney General points out, that a prisoner, being advised of his rights, may resolutely refuse to answer despite the persistence of the questioner; and that a prisoner who does not refuse under such circumstances may be said to have waived his right to do so. But the decisions of our Supreme Court make clear that this is not the kind of waiver which will make the statements admissible.

In *People* v. *Luker* (1965) 63 Cal.2d 464 [47 Cal.Rptr. 209, 407 P.2d 9] the defendant was arrested in Florida and was there advised of his rights. In the course of returning from Florida the officers engaged the defendant in conversation and

elicited statements which were used in evidence. The Supreme Court said (at p. 474):

"Before Luker gave the above statements he stated that he did not wish to talk until he had contacted his attorney. Despite this request, the officers continued to question him. In *People* v. *Anderson* (1965) *ante*, p. 351 [46 Cal.Rptr. 763, 406 P.2d 43], we said: '. . . the request [for counsel] does not lose its force because the questioning continued. The denial of the right to counsel by evasion or neglect of the suspect's request for counsel constitutes no less a constitutional violation than a denial by explicit rejection.' (*Ante*, p. 362.) Consequently, the statements obtained as a result of the above inquiry should not have been admitted into evidence under *Escobedo* v. *Illinois, supra,* 378 U.S. 478."

For other applications of this rule see *People* v. *Stockman* (1965) 63 Cal.2d 494, 501 [47 Cal.Rptr. 365, 407 P.2d 277]; *People* v. *Buchanan* (1966) 63 Cal.2d 880, 886 [48 Cal.Rptr. 733, 409 P.2d 957].

The *Stewart* and *Luker* cases have been distinguished in *People* v. *Lookadoo* (1967) 66 Cal.2d 307 [57 Cal.Rptr. 608, 425 P.2d 208] and *People* v. *Hill* (1967) 66 Cal.2d 536 [58 Cal.Rptr. 340, 426 P.2d 908], but upon facts readily distinguishable from the case at bench.

In neither the *Lookadoo* nor the *Hill* case were the incriminating answers elicited by persistent interrogation in the face of the prisoner's statement that he wished to consult counsel.

The record at bench brings this case well within the rule applied in *Anderson, Luker, Stockman* and *Buchanan*. At the beginning of the first conversation in Guadalajara defendant expressed his desire for counsel. The next words spoken by Officer Robertson served notice that he was not willing to wait. There is some indication early in the interview that defendant was offering to talk in order to help solve the crime; but it is clear enough later that he was attempting to postpone the questioning about his own involvement until he could see an attorney. Throughout that interrogation, whenever defendant referred to his need for an attorney, his interrogator either ignored it or made a comment implying that the request itself was incriminatory. The effect of this conduct cannot be disregarded merely because that interrogation did not immediately produce something incriminating. The significance of the Guadalajara tape is in establishing the interrogator's determination to proceed despite the prisoner's expressed desire to consult counsel first.

The officer's own testimony establishes that in San Antonio, when defendant said he wanted an attorney, the officer ignored it and pressed forward with questions designed to elicit evidence of guilt.

It is not material that no attorney was available in Guadalajara or San Antonio when defendant expressed the need for one. The same was true in the *Luker* case, as the prisoner was in transit between Florida and California. Yet his statement that he did not wish to talk until he had contacted an attorney was held to render inadmissible the statements thereafter elicited from him on that trip (see 63 Cal.2d at pp. 473-474).

The most prejudicial admissions were contained in the San Antonio statement. There the defendant fixed the time of the killing within a two-hour period, and placed himself at the scene immediately afterward. That statement also contains defendant's opinion that he "did this" because he had been "a great knife man in Korea."

Under the authorities cited, the Guadalajara and San Antonio statements are inadmissible because they were obtained by overriding the defendant's expressed desire to consult counsel.

This inadmissible evidence is not rendered harmless by reason of the fact that defendant made a similar statement in Long Beach without there requesting counsel, or by reason of his having given similar testimony at the trial. The applicable principle is explained in *People* v. *Spencer* (1967) 66 Cal.2d 158, 167-168 [57 Cal.Rptr. 163, 424 P.2d 715] :

"'We recognize that no court has ever 'gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.' (*United States* v. *Bayer* (1947) 331 U.S. 532, 540-541 [91 L.Ed. 1654, 1660-1661, 67 S.Ct. 1394].) Nonetheless, the courts have not been blind to the fact that 'after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good.' (*Id.*, at p. 540 [91 L.Ed. at p. 1660].) In this sense, a later confession may always be viewed in part as fruit of the first. (See Note (1963) 72 Yale L.J. 1434, 1442-1443.) We must therefore recognize that it is always *possible* that an improperly obtained confession will induce the defendant to render a later admission of guilt. 'Admittedly, it is difficult to

determine whether there is a connection between two confessions. But, human nature being what it is, we must recognize a presumption that one is the fruit of the other.' (*Killough* v. *United States* (1962) 315 F.2d 241, 249 [114 App.D.C. 305] (Wright, J., concurring); see also *People* v. *Jones, supra,* 24 Cal.2d 601, 609-610 [150 P.2d 801].)

"To overcome the likelihood that the erroneous introduction of defendant's extrajudicial confession impelled his testimonial one, the State bears the burden of showing that the causative link between the two confessions had been broken. '[T]he beneficiary of a constitutional error [must] prove beyond a *reasonable doubt* that the error complained of did not contribute to the verdict obtained.' (Italics added.) (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824].)"

In the case at bench it is impossible to assert that, beyond a doubt, the defendant's Guadalajara and San Antonio experiences did not cause him to say what he did in the Long Beach jail and at the trial. The Long Beach interrogation occurred less than 36 hours after the San Antonio statement had been signed. The Long Beach session commenced with the usual advice about the right to counsel; but defendant had already told Officer Robertson that he wanted to see counsel before talking, and defendant had already learned that Officer Robertson wouldn't stop asking questions on that account. So it is difficult to infer a waiver merely because he failed to keep requesting something which he had theretofore asked repeatedly without effect. The Long Beach interrogation commenced with Officer Robertson's request to defendant to repeat the statements he had made on the prior occasions. Defendant then proceeded to relate substantially what he had said at San Antonio, with some additional matter. In this context the Long Beach statement appears beyond dispute as the product of the San Antonio interrogation, and subject to the influence which made the former statement inadmissible.

At the trial the prosecution's case rested almost entirely upon defendant's extrajudicial statements. It is more than possible that defendant would never have testified if that evidence had been excluded. The *Spencer* decision[4] compels a

---

[4] "In determining the effect of defendant's extrajudicial confession upon the outcome of the instant trial, we must consider the likelihood that it contributed to the verdict by *inducing* the defendant to admit his guilt in open court. . . . In such a case, not even overwhelming evidence of guilt apart from the confession could purge the error of its presumptively prejudicial effect." (66 Cal.2d at pp. 163-165.)

determination that the error in receiving the extrajudicial statements is not cured by the defendant's testimony. (Accord: *People* v. *Arnold* (1967) 66 Cal.2d 438, 450 [58 Cal.Rptr. 115, 426 P.2d 515]; *In re Shipp* (1967) 66 Cal.2d 721, 727 [59 Cal.Rptr. 97, 427 P.2d 761]; see *People* v. *Powell,* 67 Cal.2d 32, 56 [59 Cal.Rptr. 817, 429 P.2d 137].)

The judgment is reversed.

Jefferson, J., and Collins, J. pro tem.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.