Filed 9/11/13  P. v. Pierre CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B244001 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA088187) |
| v. | |
| MARKUS PIERRE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Arthur Jean, Jr., Judge.  Affirmed.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and Daniel C. Chang, Deputy Attorney General, for Plaintiff and Respondent.

_____

The jury convicted defendant and appellant Markus Pierre in count 1of attempted murder (Pen. Code §§ 664, 187 subd. (a)),**1** in count 2 of first degree burglary (§ 459), in count 3 of aggravated mayhem (§ 205), and in count 4 of criminal threats (§ 422).**2** The jury found that defendant personally used a deadly and dangerous weapon in counts 1-3 (§ 12022, subd. (b)(1)). The jury found not true the allegation in count 1 that the attempted murder was willful, deliberate, and premeditated. The trial court found true the allegation that defendant served a prior prison term (§667.5, subd. (b)) as to counts 1-4.

The trial court sentenced defendant to seven years to life on count 3, plus one year for each weapon use and prior prison term enhancement for a total of nine years to life in state prison. The court imposed sentences as to counts 1, 2, and 4 but stayed the sentences pursuant to section 654.

Defendant contends the trial court abused its discretion in dismissing a juror from the case and that there is insufficient evidence to support the conviction for aggravated mayhem. We affirm the judgment.

## FACTS

*Prosecution*

Defendant was interested in Melissa D. romantically and sexually. Although Melissa knew defendant, she did not reciprocate defendant's feelings, nor was she involved in either a sexual or romantic relationship with him. Defendant called Melissa often between June 2010 and February 2011. Melissa was concerned at the frequency of the calls. She felt defendant was stalking her and believed it was necessary to change her phone number. She called the police to get a restraining order against defendant.

---

**1**  All further statutory references will be to the Penal Code, unless otherwise designated.

**2**  Three additional counts were dismissed.

At approximately 9:00 p.m. on February 25, 2011, Melissa received a phone call from defendant. Defendant did not speak to her but instead just "h[e]ld the phone." Melissa went home to her apartment alone and fell asleep on her bed next to the window.

At approximately 11:30 p.m., Melissa awoke to find defendant leaning through the window next to her bed and choking her. Defendant was squeezing her neck so hard that Melissa could barely speak or breathe. He had a scalpel in his hand and threatened, "Bitch, I am going to kill you."

Melissa fought defendant and was able to break free of his grip. As she got out of bed she noticed that her chest was cut. Melissa screamed for help and ran out of her bedroom toward the door to her apartment. As she was fleeing, she felt a cutting sensation on the left side of her back. Defendant caught Melissa on the front porch and started choking her a second time.

Melissa's neighbors, David Figueroa and Darlene Cota, heard Melissa screaming to them for help. Figueroa heard Melissa scream that she was being stabbed. Cota called 9-1-1 and told the operator a man was beating up a girl in the next apartment.[3] Cota then went out on her front porch and turned on the light. She heard someone being choked and saw defendant and Melissa on Melissa's porch. Cota recognized defendant as someone she had seen before.[4] Defendant explained that he was getting his clothes from Melissa's laundry room. When defendant walked toward Cota, Melissa ran back into her apartment, locked the door, and screamed. Defendant yelled that he wanted his things back and tried to get into Melissa's apartment. He then screamed, "Bitch I am going to kill you. I am going to get you. I am going to finish what I started." Cota saw something shiny in defendant's hand.

---

[3]     A recording of the 9-1-1 call was played for the jury and a transcript of the call was published to the jury.

[4]     Cota had seen defendant about four times. She initially met him in 2008 or 2009, when he introduced himself as Melissa's husband.

3

Cota walked past defendant and went into Melissa's apartment. Melissa appeared hysterical. She told Cota that defendant stabbed her and tried to kill her. Melissa's shirt was torn, but Cota did not notice Melissa was bleeding until later, when she saw blood on Melissa's chest, back, and side.

While the women were inside, Figueroa observed defendant running toward the street. Figueroa recognized defendant from the food bank. He had also seen defendant at Melissa's apartment on occasion. Figueroa noticed a small knife, which he identified as a scalpel, in defendant's hand.[5] Figueroa warned defendant to leave before the police got there. Defendant responded that he was going to come back and kill Melissa. Defendant made the threat when he was approximately 12 feet away from Figueroa.

Long Beach Police Officer George Evans and his partner responded to the scene. When they arrived, a woman came out of the apartment and screamed that she had been stabbed. She was wearing a white T-shirt soaked with blood. Officer Evans surveyed the area and observed the bedroom window open approximately two feet wide, and the screen lying outside on the grass. There was fresh blood on the porch leading to the bedroom. There was also blood on the bed. Melissa told Officer Evans that defendant had come through the window while she was sleeping and slashed her with a scalpel.

Soon afterward, the paramedics arrived and transported Melissa to the hospital for her injuries. Melissa's treating physician, Dr. Mauricio Heilbron, performed surgery on a minimum of six lacerations. The lacerations were serious. Some of them were disfiguring and penetrated her skin and subcutaneous fat. One of the disfiguring lacerations was made around the area of Melissa's right breast. The laceration was so deep Dr. Heilbron had to take special care to close the incision. He described it as a "horrible slash across the woman's chest and breast." Melissa's wounds were consistent with the type caused by a scalpel. He explained that her cuts were "extraordinarily clean." "The . . . breast wound has a curve to it. It is very hard to cut a curve with a

---

[5]     Figueroa had previously worked as a nurse.

serrated knife. You have to saw. And this wasn't." Melissa was hospitalized for approximately three weeks.

After Melissa left the hospital, defendant left several voice mail messages on her phone. He called her a "cheap little bitch" and threatened to beat her.[6]

*Defense*

Defendant testified that on February 25, 2011, he and Melissa were having a difficult relationship. He had been at Melissa's earlier in the day but left around 5:30 or 6:00 p.m., because Melissa accused him of having an affair and hit him. As defendant was leaving, Melissa told him she planned to call her boyfriend, Junior Mack. Melissa called defendant around 11:00 or 11:30 p.m. and sounded hysterical. She begged defendant to come back. Defendant testified that he could hear a voice in the background yelling, "Bitch, you are not going to have this baby. I hope this baby dies." Defendant heard a pounding noise and screaming. Then Mack said to defendant, "Yeah, I did that." Defendant replied that he was coming to Melissa's apartment.

When defendant got to Melissa's apartment at approximately 1:00 or 2:00 a.m., there were no officers present. He saw blood on the porch. Defendant denied attacking Melissa with a scalpel. He did not tell the police that Mack had attacked Melissa when they questioned him later, because he was afraid for Melissa and her children. He told Long Beach Police Officer Eric Fernandez his name was Carlos Pierre because he was afraid of being attacked. Defendant denied telling Officer Fernandez his twin brother, Carlos Pierre, stabbed Melissa.

---

[6]     The messages were played for the jury and a transcript was published to them.

*Rebuttal*

On rebuttal, Officer Evans testified that he was one of two officers who arrived at Melissa's apartment at 11:48 p.m. Officer Evans did not leave until 3:24 a.m. He prevented anyone from entering the crime scene while he was there.

Officer Fernandez testified that he went to Lincoln Park on February 28, 2011, at approximately 1:30 p.m., as part of his investigation of the case. He approached defendant and asked him if his name was Markus Pierre. Defendant identified himself as Carlos Pierre and stated that Markus was his twin brother. Officer Fernandez asked for defendant's identification at least five times, but defendant did not comply. Defendant got angry. He said he was tired of being harassed for things his brother did. Defendant yelled and clenched his fists. Officer Fernandez and two other officers at the scene restrained defendant and arrested him. Defendant was taken downtown for booking.

Without prompting, defendant said he would tell Officer Fernandez what happened. Defendant claimed his brother Markus hit Melissa and may have stabbed her. He drove Markus to the bus station and gave him $200. Markus was on his way to Las Vegas. Defendant did not elaborate beyond those facts, despite questioning. Officer Fernandez ran defendant's fingerprints and searched his pockets. He discovered a California State Advantage card and another access card on his person, which both bore the name Markus Pierre.

## DISCUSSION

*Discharge of Juror for Misconduct*

Defendant contends the trial court abused its discretion in dismissing Juror No. 7 in violation of his constitutional right to due process and a full and fair trial. Defendant asserts there was no basis for dismissing Juror No. 7 for serious and willful misconduct, and that dismissal of the juror, whom the parties believed was the lone "holdout" for

6

defendant's innocence, "raised the possibility that the juror was dismissed in part because she harbored doubts about the prosecution's case . . . ." Defendant's argument lacks merit.

After presentation of the evidence, the trial court instructed the jury that "[y]our first duty is to determine what facts have been proved from the evidence received in the trial and not from any other source," "[you must] conscientiously consider and weigh the evidence, apply the law and reach a just verdict regardless of the consequences," and "you must not independently investigate the facts or the law or . . . consult reference works or persons for additional information."

The jury began deliberating on July 25, 2012, at 10:45 a.m. At 3:20 p.m., the trial court received a note from the jury stating they were split on the attempted murder count (approximately 3 guilty votes and approximately 9 not guilty votes) and the mayhem count (approximately 11 guilty votes and approximately 1 not guilty vote). The note also indicated the lone holdout juror on the mayhem count "feels that she has reasonable doubt about the evidence." The note stated: "We don't think we can change her mind. Please advise." The court advised the jury to "take a big deep breath" and come back in the morning. The court then reminded the jury not to discuss the case amongst themselves or with anyone else.

The jury resumed deliberations the next morning at 9:40 a.m. At 11:25 a.m., the trial court received another note from the jury. The note indicated the jury was split on counts 1-4, and the votes were split 11 to 1 in favor of guilt for counts 2-4. The note also stated: "There is one juror that is FIRM that there is reasonable doubt regarding the evidence and so far we have been unable to budge the opinion." The court told the jury to return at 1:30 p.m., at which point the attorneys would make additional arguments.

At 11:35 a.m. that same day, Sandra Uceda, a clerk of the adjacent courtroom, contacted the trial court. Uceda informed the court that a woman, later identified as Juror No. 7, asked her whether a hung jury would result in a retrial. Ten minutes later, Jonetta Allen, the district jury commissioner, also contacted the court. She informed the court

that a woman, also later identified as Juror No. 7, asked her, "If a jury is hung, how many times can they retry the case?"

Subsequently, Juror No. 7 appeared before the trial court and was questioned on the record:

"The Court:  . . . Juror No. 7, it has come to my attention that some things may have happened.  One thing that is suggested is that you went next door and had a conversation with the clerk, Sandra Uceda, next door, and asked her if there was a hung jury, whether there would be a retrial or not.  [¶]  Did you do that?

"Juror No. 7:  Did I do that?

"The Court:  Yes, ma'am.

"Juror No. 7:  I don't know who was over there.  I just asked the question.

"The Court:  It was the clerk sitting behind the desk over here in Department D and you asked that question.

"Juror No. 7:  I just said what was the procedure, that's what I asked.

"The Court:  If there was a hung jury?

"Juror No. 7:  I just asked her what was the procedure.

"The Court:  She is right there and we can bring her over and ask her.  She reported to me that you asked her if there was a hung jury whether there would be a retrial.  Is that what you asked her?

"Juror No. 7:  I asked her if I am supposed to go up to the jury box and ask questions I have with anything to do with what the procedure is and what the law is.

"The Court:  Did you go upstairs and ask the -- one of the jury commissioners, the jury people up there, whether there would be a retrial if there was a hung jury?

"Juror No. 7:  They just said that they couldn't comment.  So I took it that they could not say anything.

"The Court:  Did you ask that question?

"Juror No. 7:  I don't know if that was the specific words.  I just said what happens."

8

After Juror No. 7 returned to the jury room, the trial court held an evidentiary hearing on the matter. Uceda testified that she worked as the clerk in the adjacent courtroom. Around 11:30 a.m., a woman wearing a green headband and blouse approached her. She asked Uceda if she could ask a general question, and Uceda replied that she could. The woman then asked if a hung jury typically resulted in a retrial. Uceda recognized the woman because she had seen her wearing a juror badge earlier that morning. Uceda asked which courtroom the woman was serving in. The woman did not answer. Uceda then asked, "Aren't you an impaneled juror?" The woman did not answer the question but instead said, "It is just a general question. You can't answer a general question?" Uceda informed the woman she could not speak to an impaneled juror about such matters and suggested the woman go back to her courtroom and contact the bailiff. They "went back and forth," and then the woman asked if she could find out in the jury room. Uceda did not know if the juror had been excused or not. She answered, "you might want to try that."

Allen testified that she was the court's district jury coordinator. Sometime after 11:30 that morning, she was approached by a fair-skinned African-American woman wearing a green top and a headband. The woman asked if she could ask a question, and Allen responded, "Okay." The woman asked how many times a case could be retried if the jury could not reach a unanimous verdict. Allen replied that she could not answer the question. The woman asked where she could find the information, and Allen stated that she could not answer that question either. The woman said, "Oh, okay" and left.

After this testimony, the trial court stated: "My inclination is to dismiss this juror for misconduct. I think she has violated an order that I have made several times not to discuss the case or seek information or consult reference works or persons for any information. The nature of the question goes right to the heart of the issue that is here before the jury. And I don't know where she lies on the case, but I don't think she belongs [on this] case."

Defense counsel objected, arguing there had been no misconduct.  The trial court disagreed and dismissed Juror No. 7.  An alternate juror was selected to replace her, and the jury reached their verdicts.

Following the jury's verdicts, defendant moved for a new trial.  At the hearing, defense counsel stated that he filed a declaration executed by Juror No. 7 establishing she was the holdout juror.  The trial court denied defendant's motion for new trial, stating:  "I dismissed juror number seven because, either expressly or by implication, I found that her -- there was misconduct, there were at least two instances of misconduct involving the clerk in department D next door, Ms. [Uceda] and up in the jury assembly room with our jury coordinator.  It appears to me that these were willful instances of misconduct.  Before, Ms. [Uceda], she didn't have her jury badge on, she wouldn't explain why she needed this information and then she went up and sought the very same information from the jury coordinator.  I think these were serious violations of court orders.  [¶]  In looking at your declaration or in looking at your filing, you bring in [juror number] seven's declaration, she says several of the jurors were talking about the case when there wasn't a full jury in the room.  [¶] . . . [¶]  Those seem to me to be, if true, and your juror number seven is not a particularly credible reporter in my view, if true, those appear to be violations of misconduct.  But they don't appear to me to be of the serious kind of misconduct and certainly no indication of prejudice.  [¶]  When I dismissed juror number seven, I didn't know whether she was the hold-out juror or not and it didn't make any difference to me.  As you recall, you asked me to ask her and I wouldn't do that.  She could have been just as easily a juror who wanted to bring information before the jury to persuade the hold-out juror to vote the other way.  [¶]  In either instance, this was [an] attempt by juror to bring information into either her own decision-making process or into the decision-making process of the jury.  She may not do that.  I believe she was unable to properly discharge her duties.  [¶]  If you recall during the course of the hearing when I was asking her about what she did or didn't do, she was not forthcoming to this court in answering questions.  She resisted telling the truth until pushed, and even then I don't think a clear truthful answer came from juror seven.  So I found and I do find that her

conduct was misconduct, it was willful, serious, prejudicial, material to the proceedings before the court and she should be -- should have been and was properly removed by me. [¶] I must say that I've been a trial judge now for, I'm in my 28th year of service, and I've had many instances where parties have asked me to dismiss a juror. I never have, never done that. But I've never faced quite this serious a violation of court order before by a juror."

## Analysis

Pursuant to section 1089, a trial court may discharge a juror if it finds the juror is unable to perform his or her duty. We review the trial court's dismissal of a juror for abuse of discretion and will uphold the trial court's decision if it is supported by substantial evidence. (*People v. Marshall* (1996) 13 Cal.4th 799, 843 (*Marshall*).) "A juror who refuses to follow the court's instructions is 'unable to perform his [or her] duty' within the meaning of Penal Code section 1089. As soon as a jury is selected, each juror must agree to render a true verdict '"according only to the evidence presented . . . and to the *instructions of the court*."' [Citation.]" (*People v. Williams* (2001) 25 Cal.4th 441, 448.) A trial court may excuse a juror who expresses an unwillingness to follow the court's instructions. (*Id*. at p. 461; *People v. Cleveland* (2001) 25 Cal.4th 466, 483-484 (*Cleveland*).)

A dismissed juror's inability to perform his or her duty "must '"appear in the record as a demonstrable reality."' [Citation.]" (*Marshall, supra,* 13 Cal.4th at p. 843.) The trial court abuses its discretion if its dismissal is based on the juror taking a position contrary to that of the other jurors (*People v. Hamilton* (1963) 60 Cal.2d 105, 128, disapproved on other grounds in *People v. Daniels* (1991) 52 Cal.3d 815, 865-866) or based upon the juror's doubts about prosecution evidence (*Cleveland, supra,* at p. 483).

The trial court did not abuse its discretion in this case. As the Attorney General highlights, Juror No. 7 was specifically instructed "not to consider outside sources, not to independently investigate the law, not to consult people for additional information, not to

discuss the case with any person other than a fellow juror, and not to consider the consequences of the verdict." She acted against all of these instructions shortly after they were given, when she asked first Uceda, and then Allen, what the consequences of a hung jury would be. Juror No. 7 was aware that the procedure for asking questions was to send a note to the trial court through the bailiff. And, in fact, the jury had done this twice before Juror No. 7 elected to seek outside information concerning the consequences if the jury was not able to reach a unanimous vote in the case. Juror No. 7's misconduct was demonstrated on the record: she admitted to questioning both Uceda and Allen "what was the procedure" and "what happens," although she was evasive in doing so. Thus, substantial evidence supports the trial court's decision.

Defendant's argument that Juror No. 7's discharge was based on the fact that she could not reach agreement with the other jurors is belied by the record. The trial court was not aware of her position on defendant's guilt when it discharged Juror No. 7 and, in fact, refused to question her regarding her position. As the court stated at the hearing for the motion for new trial, Juror No. 7 may have been the "hold-out" seeking the information to make her own decision or she may have been another juror seeking to use the information to sway the "hold-out" to vote with the majority. In either case, the juror improperly sought outside information concerning the consequences of the jury's votes, which was misconduct in direct contravention of the court's instructions.

*Sufficiency of the Evidence Supporting the Aggravated Mayhem Conviction*

Defendant contends the evidence is insufficient to prove that he intended to maim or disfigure Melissa, and his conviction for aggravated mayhem should therefore be reversed. We disagree.

The Fifth and Sixth Amendments, which apply to the states through the Fourteenth Amendment, require the prosecution to prove all elements of a crime beyond a reasonable doubt. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278.) A conviction supported by insufficient evidence violates the Due Process Clause of the Fourteenth Amendment and

12

must be reversed. (*Jackson v. Virginia* (1979) 443 U.S. 307, 318.) "'In reviewing the sufficiency of evidence . . . , the question we ask is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."' [Citations.] . . . 'In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court "must . . . presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."' [Citation.] The same standard also applies in cases in which the prosecution relies primarily on circumstantial evidence. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1175 (*Young*).)

We review the record in the light most favorable to the prosecution to determine whether the challenged conviction is supported by substantial evidence, meaning "evidence which is reasonable, credible, and of solid value." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "[M]ere speculation cannot support a conviction. [Citations.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 35.) Nor does a finding that "the circumstances also might reasonably be reconciled with a contrary finding . . . warrant reversal of the judgment." (*People v. Proctor* (1992) 4 Cal.4th 499, 528-529.) The reviewing court does not reweigh the evidence, evaluate the credibility of witnesses, or decide factual conflicts, as these are the province of the trier of fact. (*People v. Culver* (1973) 10 Cal.3d 542, 548; *In re Frederick G.* (1979) 96 Cal.App.3d 353, 367.) "Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]" (*Young*, *supra*, 34 Cal.4th at p. 1181.)

"A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body." (§ 205.) The defendant must have the specific intent to maim the victim. (*People v. Park* (2003) 112 Cal.App.4th 61, 64 (*Park*).) Evidence of only an

13

"indiscriminate" or "random" attack or "explosion of violence" upon the victim is not sufficient to support a conviction. (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1162) "'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction. [Citations.]' [Citation.] In particular, '[a] jury may infer a defendant's specific intent from the circumstances attending the act, the manner in which it is done, and the means used, among other factors.' [Citation.]" (*Park*, *supra*, at p. 68.) "'[E]vidence of a "controlled and directed" attack or an attack of "focused or limited scope" may provide substantial evidence of' a specific intent to maim. [Citations.]" (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 831 (*Szadziewicz*).)

Substantial evidence supports the jury's finding that defendant had the specific intent to maim or disfigure Melissa. The attack was not indiscriminate, random, or an explosion of violence. Defendant came through Melissa's bedroom window wielding a scalpel, a sharp instrument especially well-suited for causing prominent and lasting wounds, as Dr. Heilbron confirmed when he opined that a knife would have required a "sawing action," whereas Melissa's wounds were consistent with a scalpel, which is designed to cut through flesh with little resistance.

Melissa was asleep and not alerted to defendant's presence until after the wound to her breast had been inflicted. Defendant focused his initial attack on her breast area, slicing through her skin to create a wound that Dr. Heilbron had to take special care to close, and which he described as "disfiguring." The wound was deep and took significant time to heal, evidenced by Melissa's three-week stay in the hospital. Several photographs of Melissa's wounds, including the wound to her breast, were admitted into evidence, and the jury had the opportunity to view their gruesome nature.

Moreover, defendant's attack was controlled when he entered the window. He did not plunge the scalpel into Melissa's chest or immediately attack her in some other way that would have been more likely to cause immediate death. He instead chose to inflict an injury on a very personal, defining part of her body in a manner that would leave her scarred and degraded should she live. (See *People v. Keenan* (1991) 227 Cal.App.3d 26,

14

36 [sufficient evidence supported mayhem conviction where wounds to the breasts "[were] a deliberate effort to degrade Ms. H. Because the disfiguration of Ms. H.'s breasts represents such an intentional violation of the integrity of her person, and because of the emotional disability that frequently attends a mutilation of this sort . . . ."].) To the extent the attack may have later become indiscriminate, this was due only to Melissa's escape from the bed. While she remained in his control, defendant's attack was directed at permanently scarring her breast. (See *Szadziewicz*, *supra*, 161 Cal.App.4th at p. 832 [evidence sufficient to support mayhem conviction where attack became indiscriminate only after victim was able to get out of his bed and offer resistance].)

An intent to cause a disfiguring wound to the breast is also consistent with defendant's motive for attacking Melissa. Defendant wanted an emotional and physical relationship with her, which he ardently pursued to the point where Melissa felt that she needed to protect herself by changing her phone number and obtaining a restraining order against him. The jury could infer in the face of such sexual rejection, defendant retaliated by disfiguring Melissa on an intimate part of her body.

The cases upon which defendant relies are inapposite. As the Attorney General argues, *People v. Sears* (1965) 62 Cal.2d 737 (*Sears*) and *People v. Anderson* (1965) 63 Cal.2d 351 (*Anderson*) both involved felony murder with simple mayhem as prohibited by section 203 as the underlying felony. The intent to commit mayhem under section 203 is not equivalent to the intent to commit mayhem under section 205, because the sections vary in their scope. "Section 205 broadly prohibits intentionally causing 'permanent disability or disfigurement . . . or depriv[ing] a human being of a limb, organ, or member of his or her body,' while the injuries which are the subject of section 203 are more narrowly and precisely defined." (*People v. Ferrell* (1990) 218 Cal.App.3d 828, 835.) In these cases, as in *People v. Lee* (1990) 220 Cal. App.3d 320 (*Lee*), which defendant also cites, there were not controlled and directed injuries to specific areas of the victim's bodies, as in the present case. The victims were attacked horrifically, but indiscriminately. (See *Anderson*, *supra*, at pp. 355-356 [defendant became enraged when a child cursed him and stabbed the child more than 60 times over her entire body]; *Sears*,

15

*supra*, at pp. 740-741 [child unexpectedly intervened when defendant attacked her mother with a pipe; and defendant hit the child several times, and killed her by puncturing her jugular vein with a knife]; *Lee*, *supra*, at p. 326 [defendant suddenly punched and kicked his neighbor several times without provocation, leaving him partially paralyzed].)  Here, sufficient evidence of a controlled and directed attack was presented to support defendant's conviction for aggravated mayhem.

## DISPOSITION

The judgment is affirmed.


KRIEGLER, J.


We concur:


TURNER, P. J.


MOSK, J.